## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| RICK BUTLER, an individual, CHERYL BUTLER, an individual, and GLV, INC., an Illinois Corporation, | Case No. 1:21-cv-6854 |
| | JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| NANCY HOGSHEAD-MAKAR, an individual, CHAMPION WOMEN, a Florida Not-For-Profit Corporation, SARAH POWERS-BARNHARD, an individual, and DEBORAH DIMATTEO, an individual. | |
| *Defendants.* | |

## COMPLAINT AT LAW AND DEMAND FOR JURY TRIAL

Plaintiffs, Rick Butler ("Rick" or "Butler"), Cheryl Butler ("Cheryl"), and GLV, Inc ("GLV"), an Illinois Corporation, by and through their counsel Danielle D'Ambrose of D'Ambrose P.C., bring this Complaint for Civil Conspiracy, Tortious Interference with Contracts, Tortious Interference with Prospective Business Advantage, Violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act, and for Violations of the Illinois Uniform Deceptive Trade Practices Act, against Defendants Sarah Powers-Barnhard ("Powers-Barnhard"), Nancy Hogshead-Makar ("Hogshead-Makar"), Champion Women, and Deborah Dimatteo ("Dimatteo"). Plaintiffs, for their Complaint, allege as follows:

## NATURE OF THE ACTION

1.      This case concerns an extraordinary campaign of business interference carried out as part of a conspiracy to destroy Rick Butler, Cheryl Butler, and their business, GLV, Inc.

2.      The Butlers operate the Sports Performance Volleyball Club, which has long been recognized as one of the top junior volleyball programs in the country. Sports Performance teams have amassed over 98 National Championship gold medals, and nearly 600 Sports Performance players have been named AAU All-Americans. In 2015, ESPN described Rick Butler as the most powerful coach in the sport of junior volleyball.

3.      Since its incorporation in 1990, the Butlers built GLV, Inc. d/b/a Sports Performance Volleyball Club and Great Lakes Center to become one of the nation's top facilities for hosting volleyball tournaments, camps, clinics, and other sporting events. GLV is nationally recognized as a premier event host that provides excellent service and quality events.

4.      Rick Butler formed what is now known as the Sports Performance Volleyball program with his former business partner, Kay Rogness, in the early 1980s. The club quickly became one of the most successful junior sports programs in the nation. Rick and Kay ran the volleyball club together as partners until Rick asked Kay to leave the business in 1989. Kay was furious that Rick wanted to continue the business without her, and, in response to Rick's offer to buy her out of the company, she threatened to destroy the program.

5.      In 1994, just weeks after Kay received her final buy-out payment from Rick, Rick was accused of having "inappropriate sexual relationships" with three players he coached in the 1980s. One such player was Defendant Sarah Powers-Barnhard.

6.      The Butlers learned that Kay was pushing to have Rick banned from coaching, so she pressured the former players to make statements about their relationships with Rick.

7.      The three former players said they had each an "inappropriate sexual relationship" with Rick when he was their coach in the 1980s. The players, according to their own statements,

were above the legal age of consent, and no law or rule prohibited coach-player relationships at the time.

8.      In 1995, USA Volleyball found "there was probable cause to believe" that Rick had sexual intercourse and a subsequent physical and emotional relationship with the three former players that began when they were 16 and 17 years old and he was their coach. USAV determined that, even though the relationships were legal under the laws at the time, it would ban Rick for five years as punishment for causing the organization "public embarrassment" and "ridicule."

9.      USA Volleyball did not express concerns that Rick was a danger to athletes in his program. Rather, they stressed that the five-year ban did not apply to events held in GLV's facility, the Great Lakes Center, or events sponsored by other organizations, such as the AAU.[1] The Sports Performance program continued to thrive, and many parents and players in the program spoke out in support of the Butlers, including the sister of one accuser, who noted "obvious falsities" in her sister's story.[2]

10.     Frustrated that her efforts did not destroy Rick's business as she had intended, Rogness continued to attack the Plaintiffs with the help of Defendant Sarah Powers-Barnhard.

11.     The allegations became common knowledge in the volleyball community, and clubs continued to attend GLV events. In 1995, the allegations were already between 8-14 years old, there were no claims of misconduct since the 1980s, and Rick was not found to have broken

---

[1] When the decision against Butler was announced in 1995, an AAU representative revealed that the organization did not agree with USAV's ruling. At the time, the AAU was an Affiliated Member Organization of USA Volleyball, and it sought reassurance that the USAV decision would not impact Rick Butler's ability to coach in AAU events. USAV assured the AAU representative that Rick was allowed to coach in AAU events without restriction.
[2] While Julie Bremner was accusing Rick of having an inappropriate sexual relationship with her, her younger sister was playing on Rick Butler's team. Despite her older sister's accusations, Bonnie Bremner continued to play for Rick in 1995 and would return to play for him again in 1996. The entire time Julie was participating in proceedings to prohibit Rick from coaching, her parents were allowing her younger sister to practice and travel under Rick's supervision. Bonnie even showed up to the USAV hearing to testify against her sister and in support of Rick.

any rule or law that prohibited such relationships. Therefore, clubs and tournament directors continued to associate with the Butlers and attend GLV's events.

12.     Throughout the 1990s, the Butlers grew GLV's event business, and they established a reputation for hosting well-organized, competitive tournaments at GLV's facility, the Great Lakes Center. Since 1994, individuals such as Powers-Barnhard and Rogness have attempted to harm the Butlers and their business, yet GLV continued to grow its programs and achieve unparalleled success. Eventually, GLV outgrew its six-court volleyball facility.

13.     In 2003, GLV Inc. purchased five acres of land in Aurora, Illinois, where it built a state-of-the-art, eight-court volleyball facility. The new building, the Great Lakes Center, is a volleyball facility that was custom-built to meet the specific needs of the volleyball players and spectators who attend its events, and it is unlike any other in the nation.[3] In addition to its volleyball courts, the Great Lakes Center features a 10,000 square foot mezzanine for spectators, an exclusive weight training facility, an athletic training room, a large deli and concessions area, and a full-time retail store.

14.     GLV's exceptional facilities and reputation for hosting quality events continued to attract new customers to its events. In 2012, GLV Inc. purchased five more acres of land to extend the facility by an additional four courts to meet the growth in its business. The Great Lakes Center now stands at 85,000 square feet and features 12 full volleyball courts.

15.     Until 2017, GLV hosted many of the largest, high-quality tournaments in the Midwest. Thousands of teams have participated in events held at the Great Lakes Center, allowing recruiters to see many of the nation's top recruits in one place.

---

[3] For example, the Great Lakes Center features several layers of wood and rubber flooring under its volleyball courts to protect the health of the athletes. USA Volleyball and its Regions, on the other hand, often host their tournaments in concrete convention centers.

16.    However, this all changed once the Defendants conspired to put the Butlers out of business.

17.    In 2014, Nancy Hogshead-Makar founded Champion Women as a legal advocacy organization for girls and women in sports. In 2016, the Defendants' campaign offered Hogshead-Makar an opportunity to insert her new business in the national discussion of sexual abuse in sports which was amplified by the then-recent Larry Nassar scandal. Rick Butler's reputation as one of most powerful coaches in the sport all but guaranteed that Champion Women's participation in the scheme would generate publicity about the new organization and provide a platform for Hogshead-Makar to promote herself.

18.    On June 23, 2016, Sarah Powers-Barnhard filed a civil complaint against the Amateur Athletic Union (AAU), alleging they violated the Florida Deceptive and Unfair Trade Practices Act and seeking to prohibit Rick Butler from coaching in AAU events. Hogshead-Makar discussed the lawsuit on Champion Women's social media page, and in the press she called it "a creative approach" to evade the statute of limitations on the alleged abuse.

19.    On May 10, 2017, Powers-Barnhard's complaint against the AAU was dismissed due to "inconsistencies" in her claims.[4] In the summer of 2017, Powers-Barnhard, Nancy Hogshead-Makar and Sarah Powers-Barnhard reached an agreement to coordinate efforts to force the Butlers out of the sport. Defendant Deborah Dimatteo joined in 2018 after finding social media posts about the conspiracy on Hogshead-Makar and Champion Women's public Facebook pages.

20.    The Defendants recognized that families involved in the Sports Performance program were among Rick's strongest supporters. Sports Performance families trusted their own personal experience with the Butlers over the decades-old accusations in the media and have

---

[4] . She refiled her complaint alleging a new set of facts, but that Complaint was dismissed, as was her third complaint. 2016-CA-00ss39-O

continued to send their children to the club year after year. Therefore, Defendants turned their attention to the individuals and entities that do business with GLV, and they carried out a sophisticated scheme that successfully interfered with nearly all of GLV's business relationships.

21.     Champion Women  led the scheme, and Hogshead-Makar's expertise in public relations, legal advocacy, and sports governance contributed to a multipronged attack on the Butlers and GLV. Dimatteo's experience in the local volleyball event business proved to be a valuable asset to the Defendants, and she quickly joined their conspiracy. Dimatteo urged Chicago-area clubs and teams to "quit supporting" GLV events with their attendance and, in March of 2018, she commented on a public Facebook post about a "big meeting" she was holding that week to persuade "all the good clubs" to leave GLV's events based on the recent negative publicity (generated by the Defendants) about Rick Butler.

22.     The Defendants capitalized on the explosive allegations made against Larry Nassar and USA Gymnastics to incite public outrage against Rick Butler and to instill fear in GLV's business associates that they, too, would be "cancelled" if they continued to do business with GLV.

23.     The Defendants perpetuated the fictitious narrative that recent accusations were made against Rick Butler that threaten the safety of the players in GLV's volleyball programs. Nancy Hogshead-Makar and Champion Women have publicly labeled Rick Butler as a "pedophile" coach. The scheme was so devious that even some of the Butlers' closest friends and business associates believed there were new allegations of sexual abuse made against Rick by a former player.

24.     Champion Women and Sarah Powers-Barnhard used the threat of negative publicity, legal repercussions, and "cancel culture" to force organizations to cut ties with the Plaintiffs. Together, they sent hundreds of threatening letters to GLV's business associates

demanding organizations immediately disassociate with Rick Butler, they made "dozens" of phone calls to the sport's governing bodies, they urged NCAA coaches to stop recruiting from Sports Performance, and they flooded GLV's corporate sponsors messages threatening boycotts and negative publicity.

25.     When Defendants could not bully Sports Performance parents to cut ties with the Butlers, the Defendants turned their focus to the schools recruiting those players. Defendants urged, and even threatened, college coaches, athletic departments, and other top-level university officials to boycott the recruitment of players from the Sports Performance program.

26.     The Defendants forced dozens of organizations to cancel contracts and terminate longstanding business relationships with GLV when they had no desire to do so. These organizations were already aware of the accusations against Rick from the 1980s, and they only ended the business relationship after being threatened with financial, reputational, and legal repercussions.

27.     The Defendants congratulate themselves on social media for their successful interference. For example, the Defendants boast about canceling GLV's corporate sponsorship agreement with Mizuno, which was worth over $1,000,000.00 to GLV. The Defendants also took credit for event cancellations at the Great Lakes Center, they congratulated themselves when facilities withdrew from valid contracts to host GLV's summer programs, and they have publicly bragged about their successful interference with thousands of GLV event registrations.

28.     The Defendants' illicit scheme has substantially and unjustifiably deprived the Butlers and GLV of the economic benefits they have earned. The Butlers and GLV are recognized throughout the volleyball community for their exceptionally organized, well-attended, and

competitive events. The Defendants have obliterated the professional reputations and goodwill earned from the Butlers' decades-long commitment to excellence.

29.     Plaintiffs have invested millions of dollars in their facility to provide the highest quality events and to develop goodwill with their customers and industry partners – goodwill that was unalterably harmed by the Defendants.

30.      Each of the Defendants received personal and/or professional benefits from their participation in the illicit scheme, such as free marketing for their businesses, professional advancement, growth of their junior volleyball business, and notoriety within the volleyball community. The Defendants have pledged to continue their illicit scheme until they have forced the Butlers and GLV out of the sport. Therefore, nothing short of an injunctive order will prevent them from continuing this crusade indefinitely.

31.     In order to fully compensate the Butlers and GLV for their damages, and to punish and deter the Defendants from repeating such egregious misconduct in the future,  this action seeks money damages in excess of Two Hundred and Fifty Million Dollars ($250,000,000.00).


**THE PARTIES**

*The Plaintiffs*

32.     Plaintiff GLV, Inc., d/b/a Sports Performance Volleyball Club and Great Lakes Center, is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 579 North Oakhurst Drive, Aurora, Illinois, 60502. Accordingly, Plaintiff GLV, Inc., d/b/a Sports Performance Volleyball Club and Great Lakes Center is a citizen of Illinois, and it conducts its business in the State of Illinois.

33.     Plaintiff Rick Butler is a natural person and citizen of the State of Illinois. Rick Butler manages the business of GLV, Inc. and the Sports Performance Volleyball Club.

34.     Plaintiff Cheryl Butler is a natural person and citizen of the State of Illinois. Cheryl Butler manages the business of GLV, Inc. and is the Club Director of the Sports Performance Volleyball Club.

***The Defendants***

35.     Defendant Champion Women is a not-for-profit corporation organized and existing under the laws of the State of Florida with its principal place of business located at 3116 St. Johns Avenue, Jacksonville, Florida, 32205. Accordingly, Champion Women is a citizen of the State of Florida. Champion Women is legal advocacy organization for girls and women in sports conducting business across the nation.

36.     Nancy Hogshead-Makar is a natural person and citizen of the State of Florida. Nancy Hogshead-Makar is a former Olympian, a civil rights lawyer, and CEO of Champion Women. The campaign against the Butlers offered free national marketing to Hogshead-Makar and her recently formed business, Champion Women. The consistent media attention on Butler all but guaranteed that Champion Women's participation in the scheme would generate positive publicity about the new organization. As a result of her participation, Hogshead-Makar was offered a position on USA Badminton's Board of Directors after she successfully pressured the organization to cut ties with Rick Butler.

37.     Sarah Powers-Barnhard is a natural person and citizen of the State of Florida. Powers-Barnhard played volleyball on a team coached by Rick Butler and Kay Rogness from 1982-1983, and she played professionally on the Chicago Breeze volleyball team coached by Rick

Butler in 1987. Powers-Barnhard is the owner of Powers Volleyball Club located in Jacksonville, Florida. Since the 1990s, Powers-Barnhard has remained on a crusade to destroy the Butlers while, at the same time, gaining recognition from the volleyball community and praise from the public.

38. Deborah Dimatteo is a natural person and citizen of the State of Nevada. Until 2016, Dimatteo was a long-time member of USA Volleyball's Great Lakes Region Board of Directors. At all times relevant to Plaintiffs' claims, Deb Dimatteo was in the business of organizing and/or hosting large-scale volleyball tournaments throughout the United States. Dimatteo runs several national tournaments each season, some of which operate as competitors to GLV's event business. Dimatteo had a financial interest in seeing GLV's event business collapse, because it would allow her to compete for GLV's business without competing against GLV's quality.


***Additional Co-Conspirators***

39. The Defendants have publicly encouraged others to act in furtherance of their conspiracy. Various others, presently unknown to Plaintiffs, likely participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint.

40. The acts charged in this Complaint were taken by Defendants and their co-conspirators, or were authorized, ordered or done by their respective agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.


**JURISDICTION & VENUE**

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

42.     Each Plaintiff is a citizen of Illinois, while Defendants Hogshead-Makar, Powers-Barnhard, and Champion Women are citizens of Florida and Dimatteo is a citizen of Nevada.

43.     Champion Women is subject to personal jurisdiction in the State of Illinois because the unlawful conduct alleged herein was directed to and emanated from this District. Champion Women has minimum contacts with this state in that it conspired to engage in tortious conduct in this state, and did engage in tortious conduct in this state, and because this lawsuit is related to those contacts.

44.     Nancy Hogshead-Makar is subject to personal jurisdiction in the State of Illinois because the unlawful conduct alleged herein was directed to and emanated from this District. Hogshead-Makar has minimum contacts with this state in that she conspired to engage in tortious conduct in this state, and did engage in tortious conduct in this state, and because this lawsuit is related to those contacts.

45.     Sarah Powers-Barnhard is subject to personal jurisdiction in the State of Illinois because the unlawful conduct alleged herein was directed to and emanated from this District. Powers-Barnhard has minimum contacts with this state in that she conspired to engage in tortious conduct in this state, and did engage in tortious conduct in this state, and because this lawsuit is related to those contacts.

46.     Deborah Dimatteo is subject to personal jurisdiction in the State of Illinois because the unlawful conduct alleged herein was directed to and emanated from this District. Dimatteo has minimum contacts with this state in that she conspired to engage in tortious conduct in this state, and did engage in tortious conduct in this state, and because this lawsuit is related to those contacts.

47.     Venue is proper in this Court pursuant to  28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

48. The Defendants' statements on social media demonstrate that each agreed to participate in a conspiracy to destroy the Butlers' professional reputations and permanently harm GLV's business relationships until they are put out of business.

49. Defendant Champion Women's first attempt to remove the Butlers from the sport was with a Change.org petition to USA Volleyball, the AAU, and the U.S. Center for SafeSport. The petition was created in June of 2017, and it called for the organizations to ban Rick Butler from coaching. The petition relied on a false and misleading presentation of the 1995 proceedings and subsequent events.

50. When the petition did not appear to achieve its goals, the Defendants resorted to more devious tactics. Just a few months after the Change.org petition was launched, the Larry Nassar sexual abuse scandal rocked the gymnastics community and ignited a culture shift that transcended sports. The Defendants capitalized on the publicity and launched a malicious campaign to destroy the Butlers and GLV with claims fabricated to provoke public outrage.

### *The Letter Writing Campaign*

51. The Defendants coordinated a letter writing campaign that circulated false and misleading information that would place Rick Butler's name alongside Nassar's in the media. For example, Champion Women posted on its Facebook public page the false claim that the letters contained "all original source materials that confirm [Rick's] pedophilia." No such documents exist, as the accusers were above the legal age of consent according to their own testimony.[5]

---

[5] Rick was even evaluated by a psychiatrist when the accusations were first made against him, and that psychiatrist concluded that Rick had "no history of any pedophiliac activity."

52.     The letter writing campaign is detailed in a series of posts found on the public Facebook pages of Hogshead-Makar and Champion Women:

a.      On June 24, 2017, Hogshead-Makar wrote on her personal Facebook page that Champion Women had written "letters to the AAU Sports, USA Volleyball and their sponsors" demanding they prohibit Rick from coaching.

b.      On July 11, 2017, Champion Women sent an email to Texas State University's Athletic Director and General Counsel with the subject: "Removing Rick Butler from coaching this summer at Texas State University, and backup materials." The letter stated, "We are writing to you today to ask you to remove Rick Butler from coaching at Texas State University this summer using your facilities at a summer camp."

c.      On July 12, 2017, Champion Women sent an email to Atlanta Performance Volleyball Club with the subject: "Removing Rick Butler from coaching this summer at Atlanta Performance VB Center, and backup materials." The letter stated, "We are writing to you today to ask you to prevent Rick Butler from coaching at a summer camp your facility, and to cease your partnership with SPVB."

d.      On July 21, 2017, Champion Women sent a letter to MSU then-Michigan State athletic director Mark Hollis and to the school's then-general counsel, Robert Noto.

e.      On July 27, 2017, Champion Women sent a letter to Crook County High School with the subject: "Removing Rick Butler from coaching this summer at Crook County High School." The letter stated, "We are writing to you today to ask you to remove Rick Butler from coaching at Crook County High School (CCHS) this summer."

f.      On November 20, 2017, Champion Women posted, "In our efforts to remove sexually abusing coaches, Champion Women has been on a sports organization/

sponsor/ school/ facility letter-writing campaign to remove Rick Butler from volleyball courts."

g.     On January 11, 2018, Champion Women posted that it sent "almost 50+ letters to sponsors, schools, and facilities" and made "dozens of phone calls with everyone in #volleyball" demanding action to prohibit Rick from coaching.

h.     On January 19, 2018, Champion Women sent a letter to Michigan State University threatening the school with Title IX violations and potential legal action if the school did not cut all ties with the Plaintiffs.

i.     On February 10, 2018, Nancy Hogshead-Makar wrote on her personal Facebook page that "Champion Women wrote 45+ letters, attaching all original-source materials, to the AAU Sports, their sponsors, Rick Butler's sponsors, every club and school he coaches clinics over the summer. We talked to the AVCA, We made the case to the media. We've now talked w dozens of parents who were drinking the Rick Butler kool aid that he slept with these players, but it was all after they were 18 and they weren't playing for him any more…We were successful in getting other schools and sports (badminton) not to play at his facilities."

j.     On March 30, 2018, Champion Women posted that it "sent another 90 letter to the volleyball clubs surrounding Rick Butler, attaching all original source materials that confirm his pedophilia."

k.     On April 24, 2018, Champion Women TIME story about Rick's connection with MSU. In this post, Champion Women also stated that Rick "was publicly accused in 1995 of sexually abusing and raping six underage girls he trained in the 1980s." This is categorically untrue.

l.      On June 15, 2018, Champion Women posted that it had "written 130+ letter to all these organizations, pleading the case [to ban Rick] on behalf of his victims."

m.      On December 13, 2018, Champion Women posted a quote about the organization that read: "The women who said Rick Butler abused them as well as Hogshead-Makar's organization, Champion Women, wrote 130 letters to clubs, sponsors and other sports organizations" demanding they prohibit Rick Butler from coaching.

### The False Information Broadcasted by the Letter Writing Campaign

53.      In emails, letters, and social media posts related to the letter writing campaign, Champion Women and Powers-Barnhard made the following false, defamatory and/or misleading statements:

a.      Hogshead-Makar repeatedly advances the false narrative that Rick Butler "was publicly accused in 1995 of sexually abusing and raping six underage girls he trained in the 1980s."

b.      That "long-standing ethics rules prohibit coaches from engaging in romantic and sexual relationships with the athletes they coach, *regardless of age or consent*." (emphasis in original)

c.      That "USA Volleyball allowed Rick Butler to reapply five years later after being threatened with litigation. USAV allowed him to hold administrative volleyball positions and to coach boys. But he is clearly not adhering to those limits; he is coaching hundreds of young girls, including those at your school, MSU. USAV is well aware of this violation, and they've done nothing."

      d.     That the "victims saved the letters that were dated in [Rick's] handwriting" which were "compared with their birth certificates" that showed the accusers were "[c]learly 15-16" years old at the time.

      e.     That Champion Women "found other victims" of Rick Butler and filed an official complaint with the US Center for SafeSport.

      f.     That USA Volleyball, the JVA, and/or the AAU made findings that Rick Butler raped volleyball players he coached.

      g.     That USA Volleyball, the JVA, and/or the AAU made findings that Rick Butler had illegal sexual relationships with players who were under legal the age of consent at the time.

      h.     That Cheryl Butler knew about Rick's abuse and that she bullied victims into silence.

      i.     That confidential DCFS records, which expunged by the Department in 1999, are evidence confirming Rick's "pedophilia."[6]

54.     On Champion Women's Facebook post, Defendant Deb Dimatteo wrote a comment encouraging others to "cut off" the Butlers' revenue by boycotting GLV events. One commenter mentioned that "the next communication campaign should be directed at the clubs" that play in those events. In response, Champion Women wrote, "we've done that, with over 90 emails to the clubs he competes against."

55.     Hogshead-Makar, Powers-Barnhard, and Champion Women have posted photos of the Butlers to their social media pages and have encouraged public discussion of possible strategies

---

[6] Furthermore, Defendants' unauthorized release of these expunged DCFS records violated the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/11.

to remove them from the sport. Defendants Dimatteo and Powers-Barnhard regularly supported these efforts on their public social media posts.

56.     The Defendants each participated in this campaign to drive GLV out of business with threats to GLV's customers and business associates. Letters sent to these individuals and entities disseminated false, misleading, and confidential information about Rick Butler and the allegations made against him. The Defendants sent these letters to GLV's customers and to any organizations known or suspected to do business with GLV.

57.     The Defendants used the threat of negative publicity, legal repercussions, and "cancel culture" to force organizations to cut ties with the Plaintiffs. They sent letters that threatened legal and financial repercussions to clubs that attend GLV events, to GLV's corporate sponsors, and to the facilities where GLV holds summer programs.

58.     The letters threatened clubs with violations of "safe-sport principles" and urged them to disassociate with Rick Butler, "including his teams, his facilities, or his personnel." In the email text, the attached letter, and the numerous articles attached thereto, Champion Women knowingly and maliciously disseminated false and defamatory statements such as:

    a.     That on "January 10, 2018, USA Volleyball found that Rick Butler sexually abused four minor girls, and physically and verbally abused a fifth."

    b.     That "Rick Butler has now been banned for life from USA Volleyball for the second time, explicitly for the sexual abuse of minor girls he coached."

    c.     That "USA Volleyball has twice imposed a lifetime ban from coaching volleyball for sexually abusing his minor athletes"

    d.     That Rick Butler is "a bona fide sexual predator"

59.     When the letters were sent, Hogshead-Makar and Champion Women knew the above-listed statements were false. USA Volleyball's 2018 hearing was not held on any claim of sexual abuse from a former player. The hearing did not involve testimony from any former players with new allegations of sexual abuse. USA Volleyball's 2018 ban did not result from any finding that Rick Butler sexually abused former players he coached.

60.     The relationships found to have occurred in 1995 did not violate any applicable law or rule, so Rick was banned for causing USAV "public embarrassment and ridicule." Likewise, in 2018, USAV banned Rick pursuant to the "public embarrassment and ridicule" provision, and USAV referenced "interpersonal sexual relationships" with a "non USAV minor" who, according to her own testimony, was above the legal age of consent at the time.

61.     Champion Women and Hogshead-Makar often claim that USAV's 1995 coaching ban was intended to prohibit Rick from any participation in the sport for his entire life. This is not true. The text of decision itself makes it clear that USAV's ban could be lifted in as little as five years, and that USAV never intended to restrict Rick's ability to coach in USAV Adult programs, USAV Junior Boys' programs, and non-USAV Junior Girls' programs (such as those sponsored by AAU).

62.     The threatening letters directed at each club, combined with the publicity of Defendants' false public narrative advanced in their public relations campaign, successfully interfered with a substantial number of GLV's valid, enforceable business contracts.

63.     The letters even boasted that Champion Women "convinced Mizuno and Molten, the volleyball sports manufacturers, to discontinue sponsoring Rick Butler's Sports Performance Volleyball Programs."

64. When one club director responded to Champion Women's letter, questioning whether Hogshead-Makar was "jumping on the financial bandwagon" and using "the kids as pawns" in her agenda, Nancy Hogshead-Makar, Sarah Powers-Barnhard, and Kay Rogness fired back with separate emails which offered even more false statements while shaming the club director for supporting a "credibly accused child sex offender."

***The Defendants Admit to Their Collusion***

65. On social media, Defendants admit to their collusion and boast about their successful interference with Plaintiff's corporate sponsorships and business relationships. Between 2017-2018, Champion Women's public Facebook page posted :

a.     "We need to be strategic and relentless in the quest" to force Rick Butler out of the sport and said that it was a team effort to pressure the AAU to ban Rick Butler.

b.     "Another Victory! USA Volleyball has banished Rick Butler from attending any event it sanctions — even as a spectator."

c.     "Our efforts are working! Mizuno has severed their ties with Sports Performance Volleyball Club and Rick Butler! Hopefully more will come. Kudos to Mizuno for not associating their brand with a known child abuser. Ok Molten, it's your turn!"

d.     "ANOTHER sponsor leaves sexual abuser Rick Butler's Sport Performance Volleyball - Molten Volleyball joins Mizuno Volleyball!!...Keep signing and sharing Champion Women's petition!"

e.     "After months of efforts, sex abuser & #volleyball coach Rick Butler has been banned for life from USA Volleyball."

66.     Champion Women publicly thanked Powers-Barnhard for her "partnership" in the "Herculean efforts to remove pedophile Rick Butler" from the sport. Champion Women also wrote that Powers-Barnhard was an "awesome teammate."

67.     In the comments of Hogshead-Makar's post on February 10, 2018, Powers-Barnhard wrote, "we could not have fought so diligently without champion women , you Nancy , [sic] ERIKA and Sydney!! Thank you for all of your priceless support!!!"

68.     Defendant Deborah Dimatteo encouraged the public to donate to Champion Women, saying that the organization's "hard work needs to continue" against the Butlers.

**The Defendants Enlisted Others to Act in Furtherance of Their Conspiracy**

69.     The Defendants designed their scheme to incite public outrage against the Butlers and elicit further acts of harm against GLV. The Defendants pressured others to share their misleading and defamatory social media posts while demanding action against the Butlers. The social media campaign created a following of foot soldiers who obeyed the Defendants' instructions and assisted the conspiracy by sharing the misinformation.

70.     When individuals or entities did not immediately comply with Defendants' demands, Champion Women took to social media to publicly shame them. The organization even targeted the sponsors and associates of those businesses to force their compliance. For example, Hogshead-Makar claims to have sent letters to AAU's sponsors when AAU did not take action against Rick.

71.     As a result of the Defendants' efforts to disseminate false information and spark public outrage against Rick, Athletico, Mizuno, and Molten were bombarded with emails, messages, and public social media posts. For example, one of the Defendants' supporters tagged

Athletico on Twitter, saying, "Why does @Athletico sponsor and support a known rapist and sexual predator in Rick Butler at Sports Performance volleyball."

72.    Hogshead-Makar was on a mission to cancel GLV's relationship with Athletico. In social media posts, she publicly shamed the organization and demanded that it "quit associating with a pedophile." In one post, Champion Women included a photo it found on a personal social media page of a player who had recently graduated from the Sports Performance program. The photo was taken at the Great Lakes Center, and it shows Rick standing alongside several recent graduates of the Sports Performance program. Champion Women publicly shamed those players for associating with Butler.

73.    Powers-Barnhard publicly shared the same photo on her own Facebook page, where she pressured Athletico to cut ties with Rick and GLV with a patently false declaration that Rick was "[b]anned from USAV, [b]anned from AAU and suspended indefinitely from JVA for sexually abusing at least 6 girls."

74.    On May 15, 2020, Sports Performance announced on its social media pages that the club entered into a new deal with Mizuno. Almost immediately, a man named F. Ray Vance who is, on information and belief, volleyball coach and friend of Powers-Barnhard, created a petition on Change.Org titled *Boycott Mizuno for SPRI sponsorship*. Vance wrote that he created the petition for members of the public "to voice [their] disapproval for a great and reputable company like Mizuno, who has some of the best volleyball gear in the world, for entering a partnership with Rick Butler and Sports Performance." The petition contained several false statements that had been repeatedly circulated by the Defendants, such as:

> The owner of the organization is a reputed predator of sexual assault against at least 7 former players...The only reason he was not charged was that statute of limitations has expired. Legal entities and governing bodies found enough evidence

to act against Butler and banning him. He has seven brave survivors who have spoken out in the media, court cases, and even had coverage in ESPN.

75.     Rick has not been accused of "sexual assault" by "7 former players" and there are not "seven brave survivors who have spoken out in the media." There are three former players who have "spoken out in the media" – the same three that first came forward in 1994 with claims dating back to the 1980s. The statute of limitations was not "the only reason" Rick was not charged. There were no "[l]egal entities" or "governing bodies" that have ever banned Rick Butler for "sexual assault" or for sexually abuse of players he coached.

76.     Powers-Barnhard was one of the first individuals to sign the petition, and she publicly thanked Vance while calling the petition "great".  Likewise, Defendant Deborah Dimatteo signed the petition shortly after it was created, writing, "No one should sponsor Rick Butler and Spvb ... he got away with murder."

77.     Another volleyball coach, Ray Costa, joined Defendants' social media campaign by sharing their posts and flooding GLV's sponsors and business associates with "tags" and comments demanding they cut ties with the Plaintiffs. Costa continuously urged others to "tag these companies" in social media posts about the allegations of abuse against Rick, explaining, "They may not respond to one, two, or three tags. But if their social media gets inundated with it, I think they will feel further pressure." Hogshead-Makar praised Costa and encouraged him to continue such acts in furtherance of the conspiracy.

78.     The Defendants' social media pages are filled with comments from individuals who, like Costa, were exposed to the Defendants' scheme and persuaded to take part in the social media campaign against the Butlers.

***The Conspiracy Inflicted Substantial, Irreparable Harm on the Butlers and GLV***

79.     The Defendants embarked on a malicious crusade to destroy the Butlers and GLV with fabricated claims that were crafted to provoke public outrage and assemble a cybermob to harass the Plaintiffs, their customers, and their business associates. They were relentless. The coordinated and targeted attack was designed by an organization specializing in sports law, governance, and public relations. Together, they effectuated a scheme that would inflict permanent, irreparable damage on the Butlers and GLV, and the scheme worked.

80.     Champion Women harassed GLV's business associates with letters, social media posts, and phone calls suggesting that they could face legal repercussions for continuing to associate with the Butlers and GLV. At the same time, the Defendants amplified their public relations campaign to associate Rick with the MeToo movement.

81.     The Defendants shared the horrific headlines in major national news outlets such as *Who Is Rick Butler? Youth Volleyball Coach Accused of Raping Teenage Girls Hundreds of Times*[7] and *Volleyball Coach Allegedly Raped 6 Underage Girls — and His Wife Is Accused of Bullying Them.*[8] They made sure the volleyball community knew how easily it would be to associate other organizations with these headlines if they refused to comply with demands to disassociate with the Plaintiffs.

82.     One club director told Rick Butler that he was pulling teams from GLV events because he "did not want to wake up in the morning and be on the front page of the Chicago Sun-Times." This was referring to the week-long Chicago Sun-Times report that the Defendants used

---

[7] Christina Zhao, Newsweek, *Who Is Rick Butler? Youth Volleyball Coach Accused of Raping Teenage Girls Hundreds of Times*, March 3, 2018, https://www.newsweek.com/who-rick-butler-youth-volleyball-coach-accused-raping-teenage-girls-hundreds-827688 (last visited September 4, 2021).
[8] Lisa Ryan, The Cut, *Volleyball Coach Allegedly Raped 6 Underage Girls — and His Wife Is Accused of Bullying Them*, February 28, 2018, https://www.thecut.com/2018/02/volleyball-coach-rick-butler-rape-lawsuit.html (last visited September 4, 2021).

to create the appearance of genuine reporting and investigative research that would support and publicize their false narrative that recent allegations of sexual abuse were made against Rick Butler by former players he coached.

83.     In March of 2018, Deb Dimatteo wrote on Facebook that she was "working on that hard here in Chicago" to get "all the good clubs" to leave GLV's events. Dimatteo also said that there was a "big meeting coming" up where she would pressure clubs to leave GLV events.

84.     The culmination of the Defendants' efforts created an unbearable situation for the Butlers, GLV, and any business or individual that associated with the Plaintiffs. After the Defendants sent another round of threatening letters demanding a complete boycott of GLV, clubs began contacting GLV to pull their teams from events they were registered to attend at the Great Lakes Center. These clubs were well-aware of the allegations from the 1980s, and they were only pulling their teams because they were being targeted by the Defendants' scheme. Many club directors explained to the Plaintiffs that they did not want to leave GLV's events, but they did not want to become the next target of the campaign against the Butlers and lose business like the Butlers were losing theirs.

85.     GLV lost registrations, admission fees, concessions sales, apparel sales, which were essential aspects of GLV's business model targeted by the Defendants.

86.     There were so many clubs that withdrew their registrations from GLV's Pre-National, National Junior Classic, and Youth Classic tournaments that the events were eventually cancelled. Combined, these events brought between 750-900 teams to Great Lakes Center each year.

87.     Until 2018, the National Junior Classic tournaments had been held every year since 1991 and, in the years leading up to its cancellation, it attracted 200-300 teams annually. The

cancellation was a direct result of the Defendants maliciously targeting GLV's business relationships, GLV's existing event registration contracts, and GLV's expectation for future event registrations.

88. Likewise, GLV's Pre-National tournament was cancelled in 2018 after clubs withdrew their team registrations. Until then, the tournament had been held every year since 1991 and, in the years leading up to its cancellation, it attracted 200-300 teams annually. The cancellation was a direct result of the Defendants maliciously targeting GLV's business relationships, GLV's existing event registration contracts, and GLV's expectation for future event registrations.

89. On January 30, 2018, Legacy Volleyball Club in Brighton, Michigan, emailed GLV to withdraw 5 teams the club had previously registered to play in the National Junior Classic tournament at the Great Lakes Center.

90. On February 13, 2018, Legacy Volleyball Club emailed GLV to withdraw 5 teams the club had previously registered to play in the President's Day tournament that was scheduled to take place that weekend, and the club withdrew another 3 teams it had registered for the National Junior Classic tournament at the Great Lakes Center.

91. On March 3, 2018, Volleyball Club Nebraska wrote that the club was being forced to withdraw from all GLV events after "having been negatively put in the spotlight" for associating with the Plaintiffs. The club wrote that it was in "such a tough position" and that it wanted to "to avoid a similar situation" with negative publicity. Notably, the club owner played in the Sports Performance for nearly a decade and Rick flew to Nebraska to help her start the business. She wrote that she "tried [her] best to explain [her] experiences with [Rick] personally" and explained that the risk of further harm to her business was too high to overcome.

92.     On March 6, 2018, MAVA Volleyball Club emailed GLV to withdraw all 22 teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and the National Junior Classic tournament at the Great Lakes Center. dropped all teams from both events. The email referenced "the recent negative publicity, including USAV and AAU's announced response." The club wrote, "We will miss this year's [Sports Performance] events, they are well run and the competition has always been more than we could ask for, and frankly, handle…I wish the players and coaches of Sports Performance all the best."

93.     On March 26, 2018, Wisconsin Juniors Volleyball Club emailed GLV to withdraw all teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and the National Junior Classic tournament at the Great Lakes Center. The email referenced the club's "great working relationship" with GLV. The club stated, "We do appreciate everything that you have done and continue to do" in the sport.[9]

94.     On April 3, 2018, A5 Volleyball Club emailed GLV to withdraw all teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament and said the club was "[s]o sorry" it "can't make it work."

95.     On April 7, 2018, Net Force Volleyball Club emailed GLV to withdraw all 3 teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center.

96.     On April 10, 2018, Capital Volleyball Academy emailed GLV to withdraw all 9 teams the club had previously registered to play in the Sports Performance Pre-

---

[9] On March 29, 2018, Rick received an email from a Wisconsin parent about the "lopsided" news station that "aired a news report" in Wisconsin that made them "sick." The parent offered to call the news station to make a statement in support of Rick and asked if there was anything the family could be doing for Rick and Cheryl.

Nationals tournament at the Great Lakes Center and/or the National Youth Classic tournament at the Great Lakes Center.

97.     On April 10, 2018, Club Fusion emailed GLV to withdraw all 29 teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and/or the National Youth Classic tournament at the Great Lakes Center. The club requested, and received, a refund of $13,050.00.

98.     On April 12, 2018, Sky High Volleyball Club emailed GLV to withdraw all teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and the National Youth Classic tournament at the Great Lakes Center.

99.     On April 16, 2018, Club 1 Volleyball emailed GLV to withdraw all 13 teams the club had previously registered to play in the National Youth Classic tournament at the Great Lakes Center.

100.    On April 21, 2018, D1 Volleyball Club emailed GLV to withdraw all 9 teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and/or the National Youth Classic tournament at the Great Lakes Center.

101.    On May 1, 2018, TheEdge VBC emailed GLV to withdraw all teams registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center.

102.    On May 3, 2018, Adversity Volleyball Club emailed GLV to withdraw all teams the club had previously registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center and the National Junior Classic tournament at the Great Lakes Center.

103.    On May 3, 2018, Wildcat Jrs. VBC emailed GLV, stating, "We are canceling our Youth Classic and Pre-Nationals registrations" for every team in the club that was previously registered.

104. On May 8, 2018, Eastside Volleyball Club emailed GLV to withdraw all 8 teams the club had registered to play in the Sports Performance Pre-Nationals tournament at the Great Lakes Center.

105. On July 31, 2018, the club director for MN Select emailed GLV that "MN Select does not plan to play in the National Junior Classic or the Sports Performance President's Day Challenge…Though we have been extremely pleased with the quality of the administration and competition at these events, there is too much risk of potential public scrutiny if we were to return."

106. The Defendants' campaign similarly damaged registration for GLV's boys' events. In the 2015 season, GLV hosted 4 boys' tournaments at the Great Lakes Center that brought in a total of 60 teams from 16 different clubs. In 2016, GLV hosted 3 large boys' tournaments at the Great Lakes Center that brought in a total of 49 teams from 10 different clubs. In 2017, GLV hosted 4 large boys' tournaments at the Great Lakes Center that brought in a total of 56 teams from 12 different clubs. However, in 2018, GLV hosted 4 boys' tournaments at the Great Lakes Center that brought in 13 total teams.

107. Rick started the Great Lakes Power League in the 1980s, and the Butlers worked for over 30 years to build the league into a well-run, competitive, quality event held at GLV's Great Lakes Center. Much of the revenue generated from the league was used to improve the event, which was praised for being a well-run, organized, high-quality volleyball tournament.

108. However, as a result of the Defendants' coordinated, deceitful efforts to drive clubs away from GLV, many teams withdrew from the league in 2018 after they had already registered to play in the event. The league was officially cancelled the following season due to lack of registration.

109.    USA Volleyball capitalized on the market shift, and now claims to "organize and manage 562 girls' teams in the Windy City Power League" it hosts. However, the league was quickly scrutinized for being disorganized and poorly managed. On May 8, 2018, one club director faced with the decision  concluded that switch would be "penalizing the players," because they would be forced to play in a lower-quality event.

110.    On October 21, 2018, a club director emailed Rick saying, "I am not a big fan of the Great Lakes Region and Windy City Power League, especially the people and clubs that are now part of the coup and running the WCPL…I have however been receiving emails from different people and clubs about the issues you're going through, some which lead me to believe we will be a target of criticism if we support GLPL and your events… Your leagues and tourneys have always been the best and most organized. We always enjoyed playing and hope that eventually things will get back to the way they were."

111.    In January of 2019, that club director wrote an email to all other clubs in the Region to express his frustrations with the quality of the league, stating,  "I cannot be the only club director that feels that sending my families out…90 minutes from our location…to play 2 matches in the windy City Power League" is unacceptable. The coach continued, "I participated in the [Great Lakes Power League run by GLV] for the past 4 years and because of the insider push to sink that league I have been forced to switch my teams over to this league." The director said that he could not remember ever facing a similar situation when playing in the Great Lakes Power League, and he concluded that it was "not fair for [the club] to put [its] parents through" the aggravations caused by the new league.

112.    The Defendants' campaign also targeted the facilities where GLV hosts camps, clinics, and other events urging those organizations to immediately disassociate with Rick Butler

and his business. The letters included the same information that was sent to "Chicago-area clubs" by Champion Women. However, many of the facilities rented for camps are colleges and universities. Therefore, in these letters, the Defendants emphasized the school's "legal duty" to cut ties with Butler under Title IX that would, according to Champion Women, threaten the "insurance or assets that schools must protect." Many of these schools were forced to cancel contracts because higher levels of administration and/or legal counsel, in the midst of the MeToo movement, feared the legal repercussions and public backlash threatened by the Defendants. In fact, schools were so afraid of being publicly accused of "conducting business with a known sexual abuser" that they cancelled GLV events when Rick was not even scheduled to attend.

113.    GLV had no issue registering campers, and the Defendants knew this. Therefore, they attacked GLV's contracts and business relationships to ensure that GLV had nowhere to host the camps.

114.    The class action complaint propelled the Defendants' scheme by specifically referencing the names of 15 organizations that do business with GLV, such as Universities that rent gym space to GLV for summer camps, sports facilities that host GLV events, and/or volleyball clubs that have associated with GLV. These organizations became a target for the Defendants' harassment and public shaming. The law firm sent document preservation letters to these organizations and their employees (plus many others) meant to worry them about potential future involvement in the highly publicized class action and to intimidate them from continuing to associate with GLV and the Butlers.

115.    Many individuals and entities acknowledged that the Defendants' coordinated tactics made them reconsider their business relationship with GLV. Owners and employees of these organizations were afraid that their names would get dragged into a lawsuit or a news article

after they had received intimidating legal correspondence to their business and/or personal addresses.

116.     One club owner informed the Butlers that her club nearly lost its volleyball facility because her club was targeted by the Defendants, and that the mayor of her city brought her in for questioning about her club's connection with Sports Performance and the Butlers. That club owner said she was afraid she was going to lose her business over the backlash. She and members of her club were harassed at tournaments, and her competitors use the false information perpetuated by the Defendants to harm her business.

117.     On February 21, 2018, GLV entered into a contract with Texas State University ("TSU") to host a GLV summer camp at the University. Since 2006, GLV held summer camps, with overnight and food accommodations, at TSU each year until the University cancelled its most recent contract with GLV in April of 2018. GLV's camps that provide overnight accommodations are historically very well-attended because they offer a package deal with multiple training sessions per day, and parents are only responsible for transportation once at the beginning of camp and again at the end.

118.     GLV generated approximately $225,000.00-$250,000.00 in revenue each year from the TSU camps. Throughout the 10-year business relationship, GLV paid TSU approximately $530,000.00 in rental fees for its summer camps. GLV reasonably expected its business relationship with TSU to continue far past 2018 based on the successful, long-standing business relationship between GLV and TSU.

119.     Despite the negative publicity about GLV and Rick Butler, registrations in 2018 were higher than the year before, largely due to GLV's longstanding presence and reputation in Texas for hosting successful summer volleyball camps each year. TSU camps were particularly

successful because players from all over the nation could attend and stay in dorms. In 2018, players from 5-6 different states were traveling to Texas to attend the GLV camps. At the time of cancellation in 2018, the camp had approximately 120 registrants, and GLV anticipated it would have approximately 600 registrants by the time the camps took place.

120.    TSU had known about the allegations against Rick for years prior to its 2018 cancellation. Before the 2017 camp, Champion Women contacted TSU coaches demanding the University disassociate from Rick and GLV. TSU had its own background checks that Rick had passed every year. TSU employees decided to move forward with the 2017 camp.

121.    TSU's volleyball coaches, who had years of experience working with GLV and the Butlers, did not want to cancel their contract with GLV in 2018. However, the Defendants went above those coaches and targeted high-level employees and legal counsel at the University asserting they had legal duties to cut ties with the Plaintiffs under Title IX. Those higher-level employees ultimately forced the volleyball coaches to cancel the contract after receiving Defendants' threats of potential legal action arising from the school's relationship with GLV.

122.    However, when the TSU camps were canceled, many players had already registered and made plans to travel to TSU in San Marcos, Texas. GLV attempted to find a new facility after TSU's last minute cancellation, but there were very few locations that could adequately provide the housing, food, and gym facilities required to run a five-day camp, especially with just a few months' notice.

123.    In 2017, GLV entered into a contract to rent the facilities of Schoolcraft College in Michigan for a GLV summer camp. As a result of the Defendants' various campaigns targeting the business relationship, Schoolcraft cancelled the contract and GLV was forced to relocate to a location much further away from Schoolcraft. The last-minute cancellation made it impossible for

GLV to find another location that could provide the housing and meals that would have been provided by Schoolcraft.

124.     GLV and Legacy Sports Center entered into a valid business contract to secure dates for GLV's 2018 camps that would be held at the Michigan facility. Legacy Sports Center was aware of the allegations made against Rick when entering this contract. However, once the Defendants' campaign began targeting GLV's business relationships, that same director of Legacy Sports Center emailed GLV to cancel the contract, stating that the organization was uncomfortable hosting the camp.

125.     After Legacy Sports Center canceled its contract with GLV for 2018 summer camps in Michigan, a coach who brought her team to one of GLV's 2017 summer camp suggested that GLV reach out to Brownstown Sports Center. GLV contacted Brownstown and signed a valid contract to rent gym space from the Brownstown Sports Center to host its 2018 summer camps in Michigan. GLV's camp at Brownstown Sports Center was expected to generate approximately $35,000.00-$50,000.00 in 2018. However, the Defendants targeted this contract and encouraged at least one coach in the area to contact local news stations about the event. GLV's camp, and the allegations against Rick Butler, became the top story for news stations in the area. While the event still took place at Brownstown Sports Center, only two of the twelve registered teams attended the camp.

126.     The Defendants' unjustified interference with GLV's contracts with schools, sports facilities, and its customers in Michigan resulted in a 90% drop in camp business between 2017 and 2018.

127.     On February 23, 2018, a GLV employee emailed Team Sportsplex in Baton Rouge, Louisiana, to confirm GLV's agreement to rent the Baton Rouge facility and to ask whether

Team Sportsplex preferred to finalize details at that time or to wait until shortly before the camp would take place in July of 2018. On March 1, 2018, Director of Operations responded that it would be canceling the contract. By 2018, GLV had been associated with the management of Team Sportsplex for more than 5 years and ran very successful camps for them in the Baton Rouge area. Based on prior success of the camps and the longstanding business relationship, GLV was expecting to generate approximately $50,000.00 from the camp.

128.    In 2017, GLV held a summer camp at the University of Central Florida. That same summer, Champion Women sent a threatening letter to the school demanding that it cut ties with Rick Butler. For five years, GLV held a summer camp at UCF until the University cancelled the business relationship in 2018 after Champion Women threatened the school with legal action and Title IX violations.

129.    The head volleyball coach was already aware of the allegations from the 1980s and advocated for GLV's camps to continue at the University. Hogshead-Makar went to University officials and legal counsel with her threats. As a result, the University's lead counsel became involved in the decision in approximately August of 2017.

130.    UCF's volleyball program wanted to host the 2017 summer camp, GLV was willing and able to run the 2017 camp, but the contract was cancelled and GLV was forced to discontinue the UCF camp, which generated approximately $50,000.00 profit to the business each summer.

131.    By 2018, GLV and Benedictine University ("BU") had maintained a consistent business relationship for over 20 years. Cheryl Butler is a graduate of the school, where she played on the volleyball team coached by Defendant Deb Dimatteo. Benedictine University has employed Sports Performance graduates as coaches for both the men's and women's volleyball teams.

132.     BU is another location, like TSU and Schoolcraft College, that provides overnight accommodations which allow players to travel from out of town to attend GLV summer camps. Over the course of the business relationship, GLV paid Benedictine over $1,000,000.00 in rental fees and brought over 10,000 campers to the University for GLV camps.

133.     However, when the Defendants targeted Benedictine University as part of their scheme against the Plaintiffs, the President of Benedictine University sought to cancel the school's business relationship with GLV. Like the other schools, attacks on BU were not limited to the threatening letters sent from Champion Women. Benedictine was a key subject of the Defendants' orchestrated attack because they knew the University was a major source of revenue for GLV.

134.     The President that sought to cancel GLV's camps ended up leaving the school, and he was replaced with a prior President of the school who, based on his prior experience with the GLV and Butlers, was not as easily influenced and allowed the camps to proceed. However, the relationship with BU did not recover, and BU refused to extend a contract for the summer of 2022.

135.     Champion Women also sent letters to organizations that host events at GLV's Great Lakes Center. Champion Women successfully targeted a college match between the University of Wisconsin and Marquette University, which was cancelled after the schools received threatening letters from the organization. The match was scheduled to be held at the Great Lakes Center because several members on the two teams were Sports Performance alumni, and neither school wanted to cancel the match. When they selected GLC to host the match, coaches on both teams were aware of the allegations from the 1980s. They expressed their support of the Butlers when questioned by their respective administrators. However, they were forced to cancel by administration due to the threats and risk of backlash.

136. Hogshead-Makar even contacted the University of Wisconsin Athletic Director to complain about the University players who openly supported the Butlers as recent graduates of the Sports Performance program. On information and belief, the Athletic Director told Hogshead-Makar that the school would support its student athletes.

137. On February 9, 2018, Champion Women posted an article to its public Facebook page about the Marquette/Wisconsin event cancellation. In the public post, Champion Women wrote, "Do you know who wrote to these school about the dangers of this sexually abusing coach, Rick Butler? That's right, we did! Thank you for listening University of Wisconsin-Madison and Marquette University!"

138. USA Badminton agreed to cancel plans to host its national championship tournament at the Great Lakes Center, Champion Women posted on Facebook applauding the decision. Defendant Nancy Hogshead-Makar now sits on the Board of Directors for USA Badminton.

139. In the years prior to the conspiracy, similar the attacks on the Butlers and GLV were ineffective. For example, Defendant Dimatteo commented on a February 10, 2018, Facebook post to encourage Hogshead-Makar to "contact lewis university" about GLV's agreement to host the annual Mizuno GLVC/GLIAC Crossover Volleyball Tournament. The event is the nation's largest collegiate volleyball tournament and was held each year at the Great Lakes Center since 2010. The two-day regional volleyball event featured over 30 NCAA DII programs from the Midwest.

140. Dimatteo wrote about Lewis University, "they ignored my warning 18 months ago and trashed me for bringing it up." Hogshead-Makar responded asking Dimatteo to send her a private message.

141.     The Defendants' coordinated efforts once again proved to be successful, particularly as to the organizations that had previously rebuffed efforts from individual Defendants. After the tournament organizers had previously ignored Dimatteo, they ultimately cancelled the event after the Defendants coordinated their efforts to threaten and/or harass organizations until they cut ties with the Plaintiffs. Dimatteo then encouraged the public to donate to Champion Women, saying that the organization's "hard work needs to continue" against the Butlers.

142.     Dimatteo publicly advocated for the Orange County Convention Center, the Louisville Convention Center, and Disney's ESPN Wide World of Sports to prohibit Rick from attending events at their sports facilities. Champion Women and Sarah Powers-Barnhard also contacted Disney's ESPN Wide World of Sports, which hosts the AAU's National Championship tournament, demanding that Rick be banned from its property. On May 23, 2018, Disney contacted Rick with a letter stating that he would be prohibited from all Walt Disney Resort Properties, including the ESPN Wide World of Sports Complex. This prohibited Rick from attending the National Championship tournament.

143.     The Defendants' unjustified interference in the Plaintiffs' business dealings resulted in the loss of a 10-year deal with Mizuno that included sponsorships, free merchandise, and product discounts worth over $1 million to Plaintiffs over the course of the contract. Mizuno did not want to end the deal, and the Plaintiffs did not want to end the deal. However, the Defendants' organized attack, which included threats to boycott and expose Mizuno to negative publicity, eventually resulted in the cancellation of the deal.

144.     Since 1996, Mizuno had been a corporate sponsor of the Sports Performance Volleyball Club. In a 2017 conference call with the Butlers, Mizuno representatives explained that

their company was getting bombarded with letters and threats which were nearly identical, and Mizuno believed they were the focus of an organized campaign. During that call, the company acknowledged that it had known about the allegations against Rick since the beginning of the business relationship, but that it was worried about the company being targeted in the media with the Butlers. After pressure on Mizuno appeared to subside, the company reapproached the Plaintiffs to reestablish the business relationship.

145.    Since 2017, the Butlers have been unable to carry on their business and earn a living free from interference. To date, the Defendants continue to privately contact GLV's remaining business associates to interfere with the relationships, and, on information and belief, they are continuing to contact the media when their demands are not met.

146.    The false and defamatory information disseminated as part of Defendants' scheme destroyed Rick Butler's reputation and irreparably damaged his career opportunities. There is no way to take back the claims that Rick is a "pedophile" who "raped six players" he coached. There is nothing that can undo the damage from claims that Cheryl Butler "bullied victims" that her husband sexually abused. As a direct and proximate result of Defendants' conspiracy, the Butlers have been subjected to public hatred, contempt, scorn, obloquy, and shame.

147.    Two of the best volleyball coaches in the county are now unemployable as a result of the Defendants' concerted efforts to remove them from the sport. The Defendants robbed the Butlers of their entire life's work, destroyed their names and reputations, and publicly turned them into pariahs in the volleyball community.

148.    Defendants' conduct as alleged above was done in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm. The Butlers are entitled to an

award of punitive damages to punish the Defendants and to deter them from repeating such blatant unlawful misconduct in the future.

149.    By means of this lawsuit, the Plaintiffs seek that all Defendants be jointly and severally found liable to the extent of compensatory damages in the amount of $50,000,000.00 and punitive damages in the sum of $200,000,000.00 to address the Defendants' specific, malicious intent to harm Rick Butler, Cheryl Butler, and GLV, Inc. and the actual harm inflicted on Rick Butler, Cheryl Butler, and GLV, Inc.; awarding injunctive and other equitable relief as necessary to protect the interests of the Plaintiffs; awarding Plaintiffs their reasonable litigation expenses and attorneys' fees; and awarding such other and further relief as equity and justice may require.

### FIRST CAUSE OF ACTION
### Tortious Interference with Contracts
### On behalf of GLV, Inc. Against All Defendants

150.    Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if set forth in full herein.

151.    As described above, GLV, Inc. had valid and enforceable agreements with customers to provide volleyball-related services and host volleyball events.

152.    At all times relevant, Defendants Hogshead-Makar, Champion Women, Dimatteo, and Powers-Barnhard were aware of these agreements and contractual relationships.

153.    The Defendants unlawfully interfered with the GLV's business contracts by engaging in additional harmful conduct such as sending letters that contained false, misleading, confidential, and/or harmful information about Rick and Cheryl Butler.

154.    The allegations of abuse from the 1980s against Rick Butler have been considered common knowledge in the volleyball community since the 1990s. The individuals and/or entities

had knowledge of the allegations while they were conducting business with the Plaintiffs and entering into contracts with GLV.

155. The Defendants intentionally and unjustifiably interfered with GLV's contractual relationships with customers and other businesses and induced breaches of contract by those customers and businesses. The Defendants' interference included letters and emails sent to GLV's business associates containing misleading and confidential information, such as expunged DCFS documents in violation of the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/11.

156. The Defendants interfered with these contractual relationships with the malicious intent to cause harm Rick Butler, Cheryl Butler, and GLV, Inc.

157. As a direct and proximate result of the Defendants' willful and intentional interference with these contractual relationships, GLV's contracts were cancelled and/or breached as described in detail above.

158. As a direct and proximate result of the Defendants' willful and intentional interference with these relationships, the Plaintiffs suffered, and continue to suffer damages, including lost profits derived from such contracts, reputational harm, and other intangible economic injuries for which it is entitled to compensation and equitable relief.


## SECOND CAUSE OF ACTION
### Tortious Interference with Prospective Business Advantage
### On behalf of All Plaintiffs Against All Defendants

159. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if set forth in full herein.

160. The Plaintiffs have developed valid business relationships through which it has derived or has the potential to derive substantial economic benefit. Since its incorporation in 1990,

GLV, Inc. d/b/a Sports Performance Volleyball Club and Great Lakes Center has grown to be one of the nation's top facilities for hosting volleyball tournaments, camps, clinics, and other events.

161.    The Butlers and GLV earned a reputation for offering quality services, facilities, and products, and GLV, Inc. was nationally recognized as a premier host for volleyball events. In the years leading up to 2018, thousands of teams attended GLV's annual events held at the Great Lakes Center and at other facilities across the country. GLV, Inc. had a reasonable expectation that those business relationships would continue and that it would continue to host such events.

162.    The allegations of abuse from the 1980s against Rick Butler have been considered common knowledge in the volleyball community since the 1990s. The individuals and/or entities had knowledge of the allegations while they were conducting business with the Plaintiffs and entering into contracts with GLV.

163.    Plaintiffs had a reasonable expectation that it would enter into valid business relationships with individuals and entities to provide volleyball services and to host volleyball events. GLV's volleyball facility is among the top facilities in the nation for the sport, and GLV's events were consistently among the most competitive and well-attended junior volleyball tournaments each year.

164.    GLV was proudly described itself as "America's largest camp & clinic program" which attracted over 3,000 participants in 2017. Plaintiffs had a reasonable expectation that it would enter into valid business relationships to host events and to rent facilities for GLV events.

165.    Plaintiffs had a reasonable expectation that it would continue to into valid business relationships to host teams that attended GLV events for years, to rent out the Great Lakes Center to organizations with  a history of such rentals, and other relationships described in detail above.

166.     Nancy Hogshead-Makar, Champion Women, Deborah Dimatteo, and Sarah Powers-Barnhard were aware of the Plaintiffs' business relationships, and they knew that GLV, Inc, Rick Butler, and Cheryl Butler reasonably expected those relationships to continue.

167.     The Defendants have no valid or reasonable basis in law or fact to justify their interference. They intentionally and purposefully interfered with Plaintiffs' business relationships, and they are continuing to interfere with Plaintiffs' business relationships, with the intent to permanently injure the Butlers and destroy GLV.

168.     The Defendants' public social media pages demonstrate their concerted action with Sarah Powers-Barnhard and Deb Dimatteo when they inundated the AAU, AAU's sponsors, the JVA, the AVCA, other leaders in the sport, GLV's sponsors, GLV's customers, the volleyball community, volleyball officials, the schools and facilities that rent space to GLV for its events, the individuals and organizations that rent the Great Lakes Center to host their own events with demands to cut ties with Plaintiffs.

169.     The Defendants' acts of interference included letters and emails sent to GLV's business associates containing misleading and confidential information, such as expunged DCFS documents in violation of the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/11.

170.     The Defendants interfered with these business relationships with the malicious intent to cause harm Rick Butler, Cheryl Butler, and GLV, Inc.

171.     As a direct and proximate result of the Defendants' willful and intentional interference with these relationships, GLV's current and potential customers, as well as other GLV business associates, have been intimidated into cutting business ties with the Butlers and/or GLV.

172.     As a direct and proximate result of the Defendants' willful and intentional interference with these valid business relationships, GLV's events were cancelled and/or harmed as described in detail above.

173.     As a direct and proximate result of the Defendants' willful and intentional interference with these relationships, the Plaintiffs suffered, and continue to suffer damages, including lost profits derived from such contracts and other intangible economic injuries for which it is entitled to compensation and equitable relief.

## THIRD CAUSE OF ACTION
### Violation of the Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS 510/1, *et seq.*
### On behalf of All Plaintiffs Against Nancy Hogshead-Makar and Champion Women

174.     Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if set forth in full herein.

175.     Section 2 of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2) states, in relevant part:

(a)      A person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person:
…
(8) disparages the goods, services, or business of another by false or misleading representation of fact;
…
(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

176.     At all times relevant, Nancy Hogshead-Makar and Champion Women were acting in the course of their business.

177.     Nancy Hogshead-Makar and Champion Women publicly and intentionally disparaged, and continue to disparage, the goods, services, and business of GLV, Inc. through false

and misleading representations of fact. Nancy Hogshead-Makar and Champion Women have directed their false and misleading disparagement of GLV towards GLV's customers, potential customers, and business associates as described above.

178.    As one example, Nancy Hogshead-Makar and Champion Women have broadly asserted that players are unsafe in GLV's programs and at GLV events. Hogshead-Makar and Champion Women perpetuated the fictitious narrative that recent accusations were made against Rick Butler which threaten the safety of the players in GLV's volleyball programs. Nancy Hogshead-Makar and Champion Women falsely stated that Rick Butler is a "pedophile" coach. Nancy Hogshead-Makar and Champion Women willfully, dishonestly, and maliciously spread a false narrative that Rick and Cheryl Butler are unfit to coach junior athletes and that players in GLV programs are in danger.

179.    These false and misleading statements, along with others discussed in this Complaint, have resulted in serious injury to GLV by causing actual, and/or potential customers not to attend GLV events, by causing sports facilities to cancel their contracts and/or expected contracts for GLV's events, and by causing GLV's business associates to cut ties with GLV.

180.    These false and misleading statements, along with others discussed in this Complaint, have destroyed GLV's professional reputation and continue to impede GLV's ability to conduct business.

181.    Without judicial intervention, there is a substantial risk that GLV, Inc. will continue to be harmed by this malicious and meritless campaign. Nancy Hogshead-Makar and Champion Women have vowed that they will not stop their unlawful scheme until GLV is put out of business.

182.    Under 815 ILCS 510/2, Plaintiffs seek an order requiring Defendants to cease the deceptive practices described herein.

## FOURTH CAUSE OF ACTION
### Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act
### 815 ILCS § 505/1, *et seq.*
### On behalf of All Plaintiffs Against Nancy Hogshead-Makar and Champion Women

183.    Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if set forth in full herein.

184.    Plaintiffs seek damages, costs and attorney's fees based on violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act.

185.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS § 505/1 et seq.) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

186.    Nancy Hogshead-Makar and Champion Women engaged in deceptive acts and practices in the conduct of business, trade or commerce. Their conduct involved an extensive scheme to intentionally broadcast false and defamatory information to Plaintiffs' customers, as described in detail above.

187.    Nancy Hogshead-Makar and Champion Women have broadly asserted that players are unsafe in GLV's programs and at GLV events. Hogshead-Makar and Champion Women perpetuated the fictitious narrative that recent accusations were made against Rick Butler which threaten the safety of the players in GLV's volleyball programs. Nancy Hogshead-Makar and Champion Women falsely stated that Rick Butler is a "pedophile" coach. Nancy Hogshead-Makar and Champion Women willfully, dishonestly, and maliciously spread a false narrative that Rick and Cheryl Butler are unfit to coach junior athletes and that players in GLV programs are in danger.

188.    These accusations were broadcasted by Nancy Hogshead-Makar and Champion Women to harm Plaintiffs and drive GLV out of business. To advance their fictitious claims, Champion Women sent threatening letters and emails to GLV's business associates that included

misleading and confidential information, such as expunged DCFS documents in violation of the Illinois Abused and Neglected Child Reporting Act, 325 ILCS 5/11.

189.   Nancy Hogshead-Makar and Champion Women engaged in unfair business practices which harm consumers by depriving them of the opportunity to freely conduct business as they see fit.

190.   The misconduct of Nancy Hogshead-Makar and Champion Women involves trade practices addressed to the volleyball market generally, and their actions implicate consumer protection concerns. The false narrative perpetuated by the Defendants is intended to mislead consumers in the general junior indoor volleyball market about the safety of players and the threats to these businesses for associating with the Plaintiffs are generally directed towards volleyball market at large.

191.   Club directors have interpreted the Defendants' actions as a warning to those who participate in GLV events. The requested relief would serve the interests of consumers by encouraging consumers to participate in a free market.

192.   The conduct of Nancy Hogshead-Makar and Champion Women described in this Complaint is unfair, offends public policy, and is immoral, unethical, oppressive, and unscrupulous.

193.   The deceptive and unfair actions taken by Nancy Hogshead-Makar and Champion Women were committed during the course of conduct involving trade or commerce.

194.   As a direct and proximate result of the unfair, immoral, unethical, oppressive, and unscrupulous acts perpetuated by Nancy Hogshead-Makar and Champion Women, the Plaintiffs, Rick Butler, Cheryl Butler, and GLV, Inc., suffered substantial injuries.

195. GLV, Inc. brings this action against Nancy Hogshead-Makar and Champion Women pursuant to the ICFA to recover to actual damages, plus attorney's fees and court costs, in an amount as is determined by the Jury. In addition to damages, attorney's fees and costs, Plaintiffs seek a declaratory judgment that Champion Women and Nancy Hogshead-Makar's acts and practices violate the ICFA and an injunction to prevent Nancy Hogshead-Makar and Champion Women from violating the Act in the future, and Plaintiff seek reasonable costs and attorneys' fees pursuant to 815 ILCS 505/10a.

### FIFTH CAUSE OF ACTION
### Civil Conspiracy to Violate Illinois Law
### On behalf of All Plaintiffs Against All Defendants

196. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if set forth in full herein.

197. Each Defendant conspired together and combined with one or more other persons to accomplish, through the concerted action described above, unlawful and tortious acts.

198. In the course of this unlawful conduct, Defendants reached an agreement among themselves deprive the Plaintiffs of their business relationships and contracts as described above. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity that damaged Plaintiffs Rick Butler, Cheryl Butler, and GLV, Inc.

199. The Defendants agreed to and conspired to willfully and maliciously injure each Plaintiff in their reputation, trade, business or profession through the unlawful scheme described above.

200.    By means of this lawsuit, the Plaintiffs seek that all Defendants be jointly and severally found liable to the extent of compensatory damages in the amount of $50,000,000.00 and further seek punitive damages in the sum of $200,000,000.00 to address the Defendants' specific, malicious intent to harm Rick Butler, Cheryl Butler, and GLV, Inc. and the actual harm inflicted on Rick Butler, Cheryl Butler, and GLV, Inc.; awarding injunctive and other equitable relief as necessary to protect the interests of the Plaintiffs; awarding Plaintiffs their reasonable litigation expenses and attorneys' fees; and awarding such other and further relief as equity and justice may require.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Rick Butler, Cheryl Butler, and GLV, Inc., respectfully pray:

A.    That judgment be entered against the Defendants, Sarah Powers-Barnhard, Nancy Hogshead-Makar, Champion Women, and Deborah Dimatteo, for substantial compensatory damages in an amount not less than Fifty Million Dollars ($50,000,000.00);

B.    That judgement be entered against the Defendants, Sarah Powers-Barnhard, Nancy Hogshead-Makar, Champion Women, and Deborah Dimatteo, for punitive damages in an amount not less than Two Hundred Million Dollars ($200,000,000.00);

C.    That Plaintiffs recover their reasonable attorneys' fees and expenses from the Defendants;

D.    That injunctive and other equitable relief be entered as necessary to protect the interests of the Plaintiffs; and

E.    Awarding such other and further relief as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

Dated: December 23, 2021

Respectfully Submitted,
GLV, INC., RICK BUTLER, and
CHERYL BUTLER

By: */s/ Danielle D'Ambrose*
     One of Their Attorneys

Danielle D'Ambrose
D'AMBROSE P.C.
205 North Michigan Avenue, Suite 810
Chicago, IL 60601
P: (312) 396-4121 | F: (312) 574-0924
Danielle@DambrosePC.com
ARDC No. 6323782

*Attorney for Plaintiffs*