**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICK BUTLER, CHERYL BUTLER, and GLV, INC., | ) ) ) | No. 21 CV 6854 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| NANCY HOGSHEAD-MAKAR, CHAMPION WOMEN, and DEBORAH DIMATTEO, | ) ) ) ) ) | |
| Defendants. | ) ) | June 17, 2026 |

**MEMORANDUM OPINION and ORDER**

Plaintiffs Rick Butler ("Rick"), Cheryl Butler ("Cheryl"), and GLV, Inc. ("GLV") allege Defendants Deborah DiMatteo, Nancy Hogshead-Makar, and Champion Women weaponized decades-old sexual assault allegations against Rick to ruin Plaintiffs' volleyball business. Before the court are: (1) DiMatteo's motion for summary judgment on the claims against her for tortious interference with contract (Count I), tortious interference with business advantage (Count II), and civil conspiracy (Count V); and (2) Hogshead-Makar and Champion Women's joint motion for summary judgment on the same claims plus an additional claim against them under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") (Count III).[1] (See R. 15, Am. Compl.) For the following reasons, Defendants' motions are granted:

---

[1] Count IV against Hogshead-Makar and Champion Women under the Illinois Consumer Fraud and Deceptive Trade Practices Act was previously dismissed without prejudice and not revived. (R. 40.)

## Procedural History

The court recounts the relevant procedural history at the outset as background for its decision to consider only certain of Plaintiffs' filings concerning the motions at issue. As noted in its April 8, 2026 show-cause order ("Show Cause Order"), (R. 181), the court granted four extensions to Plaintiffs in connection with their response to DiMatteo's motion, (R. 151; R. 155; R. 158; R. 162). Indeed, the court admonished Plaintiffs that the first and second extensions were "firm" and "final," and that Plaintiffs must adhere to the new timetable or face consequences. (R. 151 (first extension indicating new deadline was "firm"); R. 155 (second extension indicating new deadline was "final" and court would rule on the motion "without Plaintiffs' response" if not timely filed).) The court also directed Plaintiffs in its third and fourth extension orders to email Defendants Word versions of their summary judgment filings with document properties intact so Defendants could verify Plaintiffs' claimed computer troubles as the basis for continued delay. (R. 158 (third extension directing Plaintiffs to email Defendants the "original non-PDF version (e.g., the Word version) of the completed response with its document properties intact" to allow Defendants to verify Plaintiffs' claim that their response was ready for filing by the January 30th deadline but for counsel's computer "crash[ing]"); R. 162 (fourth extension again ordering Plaintiffs to email Defendants "the Word version of the four documents noted" with "document properties intact" so Defendants could "verify Plaintiffs' assertions").)

2

Despite these orders, Plaintiffs filed their response brief and related documents an hour after the four-times-extended, close-of-business deadline on February 4, 2026, (R. 162; R. 163), and still did not email Defendants the correct Word versions of the relevant documents with properties intact, sending only the version filed that day instead, (R. 158; R. 162; R. 167; R. 176). Accordingly, the court ordered Plaintiffs to file a certificate of compliance by February 26, 2026, indicating that by then they had complied with the court's prior orders. (R. 169.) When Plaintiffs did not do so, the court ordered them to explain why by March 3, 2026. (R. 170.) Still, Plaintiffs filed nothing.

At the March 17, 2026 in-court hearing and again in the Show Cause Order, the court reiterated that the metadata in the original Word version of Plaintiffs' response documents would allow Defendants to test whether the documents were in fact ready for filing as of January 30, 2026. (R. 181.) But when reviewing the documents Plaintiffs provided, the court discovered that Plaintiffs saved the documents under new names, thereby changing the creation date to the filing date and raising suspicion that they said their response was ready for filing on January 30, 2026, when it was not. (Id. at 3.) The court warned that it had "adequate reason to strike or disregard Plaintiffs' response to DiMatteo's motion [and] Plaintiffs' statement of additional facts," but gave them one last chance to explain. (Id. at 3-5.)

Instead of doing so, Plaintiffs filed a "motion to clarify" the Show Cause Order at 11:44 p.m. the day their explanation was due, indicating they needed help "identify[ing] the scope" of the order so they could "include the appropriate arguments

and information" and seeking a 14-day extension from any such clarifying order. (R. 182 at 2.)  The court found the "only generous and plausible explanation" for the filing of such a motion was that Plaintiffs "neglected to review [the Show Cause Order] . . . for two weeks."  (R. 184.)  As such, the court said it would consider the issues addressed in the Show Cause Order "without the benefit of Plaintiffs' explanation."  (Id.)

As Defendants point out, Plaintiffs violated five orders in connection with their extension requests and failed to provide Word documents with the requisite metadata despite being on notice that they were required to preserve the same.  (R. 185 (citing R. 158, R. 162, R. 169, R. 170, and R. 181).)  This court has "inherent authority to sanction those who show 'willful disobedience of a court order,' act[] in 'bad faith, vexatiously, wantonly, or for oppressive reasons,' [commit] fraud on the court, [or] delay, disrupt[], or 'hamper[] enforcement of a court's order.'"  *Fuery v. City of Chi.*, 900 F.3d 450, 463 (7th Cir. 2018).  Given Plaintiffs' delay and repeated violations of court orders without adequate explanation, the court has no choice but to disregard Plaintiffs' response to DiMatteo's motion, (R. 163), and Plaintiffs' statement of additional facts, (R. 165).  (R. 181 at 3.)[2]

---

[2] Because the court disregards Plaintiffs' statement of additional facts, it need not consider Defendants' joint response thereto, (R. 177).  Defendants also ask the court to disregard Plaintiffs' LR 56.1(b)(2) response to Defendants' Joint Statement of Facts, (R. 185 at 4), but because Defendants' statement was jointly filed by all Defendants and Plaintiffs' response thereto was timely filed as to Hogshead-Makar and Champion Women's motion, the court declines to do so.

**Local Rule ("LR") 56.1**

The court next addresses the parties' finger-pointing regarding LR 56.1 noncompliance. LR 56.1 is designed to "streamline the summary judgment process" by "organizing the evidence, identifying the disputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Wilcox v. Allstate Corp.*, No. 11 CV 814, 2012 WL 6569729, at \*4 (N.D. Ill. Dec. 17, 2012); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). But given the liberties the parties have taken with their LR 56.1 filings here, the summary judgment process has been anything but streamlined.

LR 56.1 is straightforward. The movant submits a statement of material facts justifying judgment in its favor, (LR 56.1(a)(2)), the opposing party responds to that statement and if it wishes, files a statement of additional facts, (LR 56.1(b)(2), (b)(3)), to which the movant then responds, (LR 56.1(c)(2)). The movant's statement of material facts and the opposing party's statement of additional facts, if any, must "consist of concise numbered paragraphs." LR 56.1(d)(1). Both statements must also cite the "specific evidentiary material, including the specific page number" relied on to support each given fact statement, or the statement may be disregarded. LR 56.1(d)(2); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (holding facts not properly supported are "nullities"). Generally, each paragraph should include "only one or two individual allegations" to allow for an "easy response," *Malec*, 191 F.R.D. at 583; *see also Maclin v. A.M. Bus Co., Inc.*, No. 04 CV 4176, 2006 WL 463370,

5

at *2 (N.D. Ill. Feb. 22, 2006) ("The compounding of facts into an agglomerated paragraph is not permissible."), and be devoid of legal arguments, (LR 56.1(d)(4)).

In turn, responses to statements of material facts (and any statements of additional facts) are to be either admitted, disputed, or admitted in part and disputed in part. LR 56.1(e)(2). If admitting in part and disputing in part, the response must specify the parts admitted and disputed. *Id.* And disputes must be supported by: (1) citation to "specific evidentiary material that controverts the fact"; and (2) a "concise[] expla[nation] [for] how the cited material controverts" that fact. LR 56.1(e)(3) (noting that controverted fact may be deemed admitted if responding party does not adequately explain why cited material controverts such fact). Responses generally may not include legal arguments except to make objections as to admissibility, materiality, or absence of evidentiary support, among others. LR 56.1(e)(2). To the extent a party makes such an objection, the supporting argument should appear in its brief. *Id.* ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief."); *see also Richardson v. Nw. Mem. HealthCare,* No. 23 CV 0617, 2025 WL 1114398, at *1 (N.D. Ill. April 15, 2025) ("A party responding to an adversary's statement of facts may make objections based on admissibility, with the argument for the propriety of the objection in its brief."). LR 56.1 also warns that if an objection is overruled and the responding party does

6

not dispute the relevant fact identified, its failure to do so may constitute a waiver. LR 56.1(e)(2).

District courts are permitted to demand strict compliance with LR 56.1's requirements, which are neither onerous nor complex. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006). Yet Plaintiffs' response to Defendants' joint statement of facts is rife with issues. For example, while Plaintiffs purport to dispute many of Defendants' statements of fact, in most cases Plaintiffs fail to identify "specific evidentiary material" to support those disputes, often citing generally to multi-page exhibits—most of which consist of a collection of documents, (see, e.g., R. 164, Pls.' Resp. to Defs.' Jt. Stmt. of Facts ("PRDSOF") ¶¶ 53-56, 64, 66-67, 80, 82-83, 85, 87, 90, 123-26, 128, 130-31, 135-36, 140-44), or in other cases citing nothing at all, (see, e.g., id. ¶¶ 1, 3, 6, 8-17, 21, 23, 33-34, 36, 39, 94, 101).

Moreover, Plaintiffs frequently respond to the statements with objections only, (see, e.g., id. ¶¶ 31-32, 44, 50, 58, 68-70, 75, 102, 105, 107-08, 110, 132), mischaracterize objections as disputes, (see, e.g., id. ¶¶ 8, 71, 86, 93, 101, 104-06, 120-22), or respond that a fact statement is "disputed in part" but fail to specify what is admitted or disputed, (see, e.g., id. ¶¶ 1, 3-6, 9-15, 17, 21, 23, 39, 46, 48, 71, 86, 93, 101, 104). Many of Plaintiffs' responses fall into one or more of these categories and plainly violate LR 56.1. See LR 56.1(e)(2), (e)(3); *see also Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir. 1992) (affirming that LR 56.1 "requires both denial and support for that denial" when disputing a fact); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (holding "mere disagreement with the movant's asserted facts is

inadequate . . . without reference to specific supporting material"); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) ("Citations to an entire transcript . . . or to a lengthy exhibit are not specific and are, accordingly, inappropriate."); *DiPerna v. Chi. Sch. of Prof. Psych.*, 222 F. Supp. 3d 716, 718 (N.D. Ill. 2016), *aff'd,* 893 F.3d 1001 (7th Cir. 2018) (reiterating that "a response to a statement of material fact [that] provides only extraneous or argumentative information . . . will not constitute a proper denial of the fact").

Plaintiffs further object in their LR 56.1(e) responses that many of Defendants' fact statements are not supported by the evidence to which they cite but, in most cases, neglect to explain why. (PRDSOF ¶¶ 1, 3-7, 9-17, 21-23, 33, 37, 39, 45-49, 66-67, 71, 80, 93, 97, 101-04, 121-22, 124, 126, 128, 134-44.) And Plaintiffs cite caselaw and statutes to argue this point, (see, e.g., PRDSOF ¶¶ 1, 3-7, 9-17, 21-23, 33, 37, 39, 45-49, 66-67, 71, 80, 93, 97, 101-04, 121-22, 124, 126, 128, 134-44), as well as that certain evidence lacks foundation, constitutes hearsay, or is irrelevant or otherwise inadmissible, (see, e.g., id. ¶¶ 13, 16-19, 28-33, 35-36, 59-60-63, 68-70, 73, 75, 77-78, 85-86, 91-92, 102-04, 105, 108-09, 111-14, 117, 123-24), and that Defendants "selectively paraphrase[]" or use "string citations" that include "additional improper factual interpretations and narratives," (see, e.g., id. ¶¶ 4-7, 9-17, 21-22, 120). Yet "there is no reason to be citing case law in a [LR] 56.1 response," where the "only question is whether the fact asserted is contested." *Portis v. City of Chi.*, 510 F. Supp. 2d 461, 464 (N.D. Ill. 2007); *see also Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 996 (N.D. Ill. 2014) (reiterating that purpose of LR 56.1 statements and responses is

8

to "identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments"). Rather, those arguments belong in the response brief. See LR 56.1(e)(2) ("[A] party's argument that the offending material should not be considered should be included in its response or reply brief."); *see also Aponte v. Ill. Workers' Comp. Comm'n*, No. 19 CV 5260, 2025 WL 3098078, at *5 (N.D. Ill. Nov. 6, 2025) ("Per the [LR], arguments regarding objectionable or immaterial evidence or argument should be included in a response or reply brief."); *Hawkins v. Groot Indus., Inc.*, No. 01 CV 1731, 2003 WL 1720069, at *1 n.3 (N.D. Ill. March 31, 2003) ("Legal argument belongs in the briefs, not the statements of facts.").

And while Plaintiffs argue in their response that Defendants' LR 56.1 statement of facts relies on hearsay offered for the truth of the matter asserted or is otherwise inadmissible, they offer no specific examples. In fact, they do not cite Defendants' 56.1 statement at all. (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 6-7 (indicating Defendants address their "objections to the admissibility or effect of" Plaintiffs' evidence "below," but nowhere addressing same).) The court largely views Plaintiffs' responses as "improper attempt[s] . . . to avoid admitting that which is uncontestable," *Portis*, 510 F. Supp. 2d at 465, and declines to perform their due diligence for them, *Austin v. Cook Cnty.*, No. 07 CV 3184, 2011 WL 5872836, at *10 n.3 (N.D. Ill. Nov. 16, 2011) ("It is not this court's role to act as an advocate for the parties appearing before it.").

"Summary judgment is the 'put up or shut up' moment in a lawsuit," *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010), and "the penalty for failing to properly

9

respond to a movant's [LR] 56.1(a) statement is usually summary judgment for the movant," *Malec*, 191 F.R.D. at 584. Thus, the portion of LR 56.1 governing the opposing parties' response "may be the most important litigation rule outside statutes of limitations." *Malec*, 191 F.R.D. at 584 ("We cannot stress the importance of this document enough; a nonmovant's failure to adhere to these requirements is equivalent to admitting the movant's case."). Indeed, a court need not "wade through improper denials and legal argument in search of a genuinely disputed fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). And the court may "accept[] the movant's version of facts as undisputed" if the non-movant fails "to respond in the form required." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014). That said, the moving party maintains the "ultimate burden of persuasion" to show it is entitled to judgment as a matter of law, *Raymond*, 442 F.3d at 608, meaning Plaintiffs' LR 56.1 noncompliance is not, on its own, a basis for granting Defendants' motions, *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (holding movant must show summary judgment is proper even if nonmovant does not respond to motion); *see also Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (stating movants "must still demonstrate that [they are] entitled to judgment as a matter of law" despite nonmovant's "failure to comply with [LR] 56.1").

Defendants' LR 56.1(a)(2) joint statement of facts also has issues. For instance, Defendants' submission—already voluminous by virtue of its 145 paragraphs—is further enlarged by the fact that many paragraphs include multiple subparts, (see, e.g., R. 146, Defs.' Jt. Stmt. of Mat. Facts ("DSOF") ¶¶ 1-2, 4-14, 18, 23, 52, 71,

75, 78, 105, 119, 124-25, 139), as well as arguments, characterizations, and legal conclusions, (see, e.g., id. ¶¶ 34, 50, 52, 61, 66-69, 79, 92, 115, 117, 119, 120-22, 128, 135, 137-38). Such practice is improper and wastes the court's time and resources. *See Malec*, 191 F.R.D. at 583 ("Three operative concepts animate [LR 56.1(a)(3)]: facts, short, and specific."); LR 56.1(d) (permitting no legal argument in statement of fact).[3] Moreover, the court agrees with Plaintiffs that in some cases Defendants' statement reveals foundational or other evidentiary concerns. But again, Plaintiffs' objections are extensive, vague, and often unfounded. *See Aponte*, 2025 WL 3098078, at *3 (noting that the parties' "objecting on any grounds, disputing wherever possible, and including argument in their responses" reflects a "scorch-earth mentality" that "frustrates a court's effort to identify those facts that are in dispute and those that are [not]").

As such, the parties have largely "thwarted the usefulness of the [LR] 56.1 Statements as roadmaps to assist the court in pointing to the specific undisputed evidence that supports [their] position[s]." *Ogdon v. Hoyt*, 409 F. Supp. 2d 982, 986 (N.D. Ill. 2006). Although the court may strictly enforce LR 56.1 and strike the parties' filings thereby preserving the *status quo*, doing so here would not serve the ends of justice or facilitate swift resolution of this matter. See Fed. R. Civ. P. 1. Accordingly, the court admonishes the parties for their failure to comply with LR 56.1 but nonetheless performs the "dauntingly difficult task of negotiating the record"

---

[3] Defendants' LR 56.1 statement includes subheadings to which Plaintiffs object for failure to identify specific facts within the record. (See generally DSOF and PRDSOF.) The court does not consider subheadings when ruling on motions.

largely "on its own." *Portis*, 510 F. Supp. 2d at 465 (citing *Ogdon*, 409 F. Supp. 2d at 986); *see also Nichols v. Ill. Dep't of Transp.*, 152 F. Supp. 3d 1106, 1129 n.23 (N.D. Ill. 2016) (indicating the court would "overlook [LR 56.1] violations of both parties and address the issues on the merits"); *Chubb Indem. Ins. Co. v. 21 East Cedar, LLC*, No. 10 CV 7111, 2014 WL 2619469, at *2 (N.D. Ill. June 12, 2014) (finding it "preferable" to address summary judgment motion "on the merits and move this case forward" rather than deny for LR 56.1 violations). In so doing, the court ignores improper arguments, unfounded or frivolous objections (including those improperly characterized as "disputes"), and characterizations—turning to the underlying evidence itself as needed—and deems admitted those properly supported facts not refuted. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003) (disregarding "argumentative, conclusory, unsupported, or otherwise nonconforming portions" of fact statement and responses thereto); *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 898 (N.D. Ill. 2010) (disregarding rather than striking where the court can "separate plaintiffs' properly alleged facts from the improperly asserted characterizations of or conclusions drawn from those facts"); *Alvarado v. Corp. Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 938 n.2 (N.D. Ill. 2010) (disregarding fact assertions that lack evidentiary support or otherwise violate LR 56.1); *Malas v. Hinsdale Twp. Dist. #86*, No. 15 CV 10490, 2019 WL 2743590, at *4 (N.D. Ill. July 1, 2019) (looking to underlying evidence where party improperly characterized same).

## Facts

The relevant background and material facts span decades.

## A.     The Parties

Rick is a nationally recognized competitive junior volleyball coach who began as a trainer and after transitioning to coaching in 1981 when he was in his mid-20's, managed and grew Sports Performance Volleyball Club ("Performance Club") into one of the nation's top junior volleyball programs. (DSOF ¶ 1; PRDSOF ¶ 1.) Cheryl is also a prominent competitive junior volleyball coach who began coaching in Rick's program in 1986, helping to grow Performance Club into one of the top programs of its kind. (Id.) In turn, GLV is an Illinois not-for-profit corporation that for all relevant times Rick and Cheryl co-owned and did business as Performance Club, but GLV currently does business in Atlanta, Georgia, as Atlanta Performance Volleyball Club. (Id.)

Hogshead-Makar is an Olympic swimmer and civil rights attorney who advocates on behalf of girls and women for safety, accessibility, and equality in sports. (DSOF ¶ 2; PRDSOF ¶ 2.) She founded and continues to operate Champion Women, a 501(c)(3) not-for-profit organization providing legal advocacy for girls and women in sports. (Id.) DiMatteo worked for almost four decades as a professor of sports marketing and management and college volleyball and softball coach. (Id.) She now works part-time for her company, Midwest Juniors Volleyball Incorporated, serving as Director of the Annual Asics Junior National Volleyball Championship, an event she has operated for more than 30 years. (Id.)

13

**B.      1994-1995 Investigations**

During the 1990s, several former female volleyball clients accused Rick of sexual abuse and rape when they were minors in the 1980s.  (DSOF ¶¶ 3-6, 9-12; PRDSOF ¶¶ 3-6; 9-12.)  Rick's former business partner's daughter also accused Rick of raping her when she was 16 years old while she, her mother, and Rick shared an apartment in 1983.  (DSOF ¶ 8; PRDSOF ¶ 8.)  Rick admits that he had sexual relationships with his accusers but until recent years claimed that they were at least 18 years old and not clients at the time, and that those relationships were consensual. (DSOF ¶¶ 4-5, 7, 9-10, 12; PRDSOF ¶¶ 4-5, 7, 9-10, 12.)

In 1994 the Illinois Department of Child and Family Services ("DCFS") opened an investigation into Rick's conduct after one of his accusers reported being abused and two others—including former defendant in this action Sarah Powers-Barnhard— joined her.  That DCFS investigation culminated in a December 1995 opinion ("DCFS Opinion") concluding that there was "credible evidence" that Rick had engaged in child abuse against the accusers as claimed.  (DSOF ¶¶ 16-18; PRDSOF ¶¶ 16-18.)[4] The findings were discussed in the media and a third party not involved here posted a copy of the DCFS Opinion on Facebook, which has been made publicly available since June 2017.  (DSOF ¶ 19; PRDSOF ¶ 19.)

---

[4] *See also What You Need to Know About a Child Abuse or Neglect Investigation*, Ill. Dept. of Child. and Fam. Servs. (May 2024), https://www.dcfs.illinois.gov/content/ dam/soi/en/web/dcfs/documents/safe-kids/reporting-child-abuse-and-neglect/ documents/what-you-need-to-know-about-a-child-abuse-investigation-english.pdf.

Meanwhile, in July 1995 the Ethics and Eligibility Committee of USA Volleyball—the National Governing Body ("NGB") of the sport as recognized by the United States Olympic and Paralympic Committee—conducted its own hearing related to charges that Rick engaged in sexual intercourse minors. (DSOF ¶¶ 20-21; PRDSOF ¶¶ 20-21.) The accusers submitted sworn written statements before the hearing and testified at the hearing, along with Rick. (DSOF ¶ 23; PRDSOF ¶ 23.)

In a written decision on July 31, 1995, the Ethics and Eligibility Committee found that Rick had sex with all three accusers while they were minors and he was their strength trainer and/or volleyball coach, and that the "psychological harm" he caused "necessitate[d] . . . grave sanctions." (DSOF ¶ 24; PRDSOF ¶ 24.) The Committee concluded that Rick's actions "constitute[d] such immorality, lack of judgment, and unacceptable behavior as to cause [USA Volleyball], at minimum, public embarrassment and ridicule by it merely having taken place." (Id.) Rick was "expelled from membership in [USA Volleyball] for life" but could apply for conditional membership in five years if there was no evidence that he had engaged in similar misconduct and promised not to coach junior girls under age 18. (Id.) The USA Volleyball's Executive Committee affirmed the decision against Rick on appeal after its own hearing, citing "substantial evidence . . . from which it could reasonably conclude that [Rick] had sexual intercourse with three different junior players while [they were] under the age of 18 years." (DSOF ¶ 25; PRDSOF ¶ 25.)

Rick responded by filing a lawsuit in state court to enjoin USA Volleyball from enforcing its disciplinary decision against him, and he prevailed at the trial court

15

level on due process grounds. (DSOF ¶ 27; PRDSOF ¶ 27.) But ultimately, the Illinois Appellate Court upheld USA Volleyball's decision in *Butler v. USA Volleyball*, 673 N.E.2d 1063, 1066-67 (Ill. App. Ct. 1996), indicating it was not "arbitrary" or "fundamentally unfair" for USA Volleyball to conclude that it "would be subject to public embarrassment because one of its best known members had sexual relations with minor players," and Rick received "substantially more" than the "rudimentary due process" USA Volleyball's by-laws required. (DSOF ¶ 30; PRDSOF ¶ 30.)

USA Volleyball's decisions, the investigation and allegations leading up to them, and Rick's lawsuit against USA Volleyball were widely publicized in the news and social media and discussed among volleyball clubs and coaches across the country. (DSOF ¶¶ 22, 26; PRDSOF ¶¶ 22, 26.) Aspects of the oral argument before the Illinois Appellate Court in Rick's lawsuit against USA Volleyball were also publicized, including in the first issue of Sports Illustrated for Women, which reported that Rick "remained in the gym" coaching minor girls outside of USA Volleyball-sanctioned events despite the Appellate Court's 3-0 vote against him. (DSOF ¶ 31 & Ex. 10 at 11-12; PRDSOF ¶ 31.) One of the justices presiding over that matter commented at the oral argument that Rick "would have to be retarded to think there was nothing wrong with his conduct," which because of the victims' ages constituted "rape" and on two occasions "involved force." (Id.) Meanwhile, other news articles at the time reported that a criminal investigation had commenced regarding Rick's sex offenses but that the statute of limitations had expired as to his accusers, (DSOF ¶ 32 & Ex. 10 at 4 and Ex. 17 at 8), and that a total of six victims had publicly

come forward during this period alleging Rick had sex with or sexually propositioned them while they were also minors, (DSOF ¶¶ 32-33).

While this media frenzy played out, Rick gave interviews denying wrongdoing, claiming his sexual relationships with former players were consensual and not criminal under then-applicable law, pointing out that accusations levied against him were many years old, and touting his success as a coach. (DSOF ¶¶ 34-35; PRDSOF ¶¶ 34-35.) Cheryl also publicly defended Rick, attacking his accusers' credibility in an article published in *Volleyball* magazine and elsewhere. (DSOF ¶ 37; PRDSOF ¶ 37.)

In 2000 Rick applied for and USA Volleyball granted him conditional membership, allowing him to register as chaperone and club director for junior girls, sit on the bench at matches, travel with players, and stay overnight with them, even though his lifetime ban on coaching girls at USA Volleyball events remained. (DSOF ¶ 38; PRDSOF ¶ 38.) But Rick continued to coach thousands of junior girls at non-USA Volleyball-sanctioned events through Performance Club and at events the Amateur Athletic Association ("AAU") and the Junior Volleyball Association ("JVA") sponsored. (DSOF ¶ 40; PRDSOF ¶ 40.)

## C.    2016-2018 Investigation

Beginning in the 1990s and into the 2010s, sports organizations prioritized athlete sexual abuse investigations and helped—along with Defendant Hogshead-Makar—draft model legislation to guard against such abuse and form the U.S. Center for SafeSport, a centralized organization charged with investigating and adjudicating

17

sexual abuse allegations in sports. (DSOF ¶¶ 44-45 & Ex. 3 at 28, 30-35; PRDSOF ¶¶ 44-45.) In the interim, sports organizations took matters into their own hands, implementing coaches' codes of ethics, updating bylaws, and forming task forces, including at USA Volleyball and AAU. (DSOF ¶¶ 44-45; PRDSOF ¶¶ 44-45.)

After an AAU task force recommended that the AAU remove members who had been deemed ineligible by another youth organization, ESPN's "Outside the Lines" asked AAU about its affiliation with Rick. (DSOF ¶¶ 46-47 & Ex. 25; PRDSOF ¶¶ 46-47.) As a result of its reporting, in 2015 ESPN announced on national television and in print that AAU was conducting sweeping reviews of its child-protection policies and that Rick would step down from his AAU administrative duties. (Id.) In the same story, ESPN published an email from AAU's CEO to its approximately 670,000 members reflecting the same information and an interview with Powers-Barnhard (previously a named defendant in this case) in which she spoke publicly for the first time about how Rick sexually abused her. (Id.)

Because of the publicity this ESPN report generated, Rick and Cheryl arranged a meeting with the senior class of Performance Club players and their parents to discuss the allegations against Rick, including the 1995 USA Volleyball investigation and lifetime ban and the DCFS investigation. (DSOF ¶¶ 48-49 & Ex. 8 ¶ 12; PRDSOF ¶¶ 48-49.) During the meetings, Rick generally acknowledged he made mistakes, but stressed they occurred many years ago and he was working hard to be the best person he could be. (DSOF ¶ 49 & Ex. 1 at 330-31; PRDSOF ¶ 49.) Nevertheless, the broader buzz around Rick continued, with news outlets, athletic organizations, and online

18

communities debating whether Rick should be allowed to coach minor girls. (DSOF ¶ 50; PRDSOF ¶ 50.)

Then in June 2016, Powers-Barnhard filed a civil suit against AAU asserting that it was violating a state law by going against its own bylaws and allowing Rick to continue as an AAU member despite having a reasonable basis to believe he had engaged in sexual assault. (DSOF ¶ 51; PRDSOF ¶ 51.) In a public statement about the case, Rick, who was not a named defendant in the lawsuit, emphasized that he has "coached over 20,000 junior age female athletes" since 2000 without "a single complaint or accusation," he has "never sexually abused any individual," the allegations made by Powers-Barnhard and the other accusers in the 1995 USA Volleyball investigation were "absolutely false," and his teams would attend the AAU National Volleyball Championships as they had done for 35 years. (DSOF ¶ 52; PRDSOF ¶ 52.) But after previously unknown allegations about Rick came to light, USA Volleyball started an investigation in 2016, which led to the filing of a second internal complaint against him. (DSOF ¶¶ 53, 56-57 & Ex. 6.) Shortly thereafter, Rick filed another lawsuit against USA Volleyball in state court seeking injunctive relief. (Id. ¶ 57; PRDSOF ¶ 57.)

Concerned about public perception and athlete safety, Chicagoland volleyball clubs and teams began to move away from Plaintiffs' league in July 2017, joining instead USA Volleyball's Great Lakes Region's Windy City Power League. (DSOF ¶ 58; PRDSOF ¶ 58.) In response, on July 12, 2017, Cheryl sent an email to Performance Club parents and players, describing a "smear campaign" against Rick

19

concerning "the same allegations from the 1980's that were dealt with and settled 22 years ago" and inviting anyone who wanted to discuss it to reach out for a meeting. (DSOF ¶ 59; PRDSOF ¶ 59.)

When Hogshead-Makar first learned in 2016 that Rick continued to coach minor girls despite USA Volleyball's lifetime ban for sexual abuse, she viewed that fact as a systemic failure to protect female athletes. (DSOF ¶¶ 61-62; PRDSOF ¶¶ 61-62.) She was particularly troubled that USA Volleyball urged the accusers involved in the 1995 proceedings against Rick to keep confidential its findings against him, which in her view prioritized USA Volleyball's interests over the safety of athletes, discouraged abuse reporting, and confirmed that abusive coaches would receive the benefit of the doubt. (DSOF ¶ 63; PRDSOF ¶ 63.) She sought to bring attention to this matter through a letter-writing campaign beginning in June 2017, initially sharing publicly available information with schools, facilities, and sponsors with whom Rick was affiliated—including Mizuno, Spaulding, and Molten USA—with the goal of making sports safer for athletes (the "Letter-Writing Campaign"). (DSOF ¶¶ 64-65, 71 & Ex. 3 at 310-12; PRDSOF ¶¶ 65, 71.)[5] Through her letters, Hogshead-Makar summarized the findings against Rick, attached materials such as Rick's 1995 USA Volleyball hearing testimony, the 1995 USA Volleyball decision, the 1995 DCFS

---

[5] Plaintiffs object to Defendants' statement because it is supported by counsel's declaration, rather than by Hogshead-Makar, and because the declaration does not directly support the paragraph's factual assertions. (PRDSOF ¶ 71.) But Plaintiffs do not dispute that Hogshead-Makar sent the letters, which are also cited and attached, and fairly reflect the substance of Defendants' fact statement. (DSOF ¶ 71 & Exs. 29, 30-33; PRDSOF ¶ 71.) And the court has no concern that a proper foundation is lacking.

Opinion finding Rick "not credible," a Change.org petition asking AAU to honor USA Volleyball's lifetime ban, ESPN's "Outside the Lines" reporting, and other news articles, and asked recipients to draw their own conclusions on whether Rick should continue to coach. (DSOF ¶¶ 71-73; PRDSOF ¶¶ 71-73.) Hogshead-Makar noted in her letters that the effort was "bigger than removing a single coach from contact with athletes. It is about getting sport [NGBs] to abide by their own rules regarding sexual abuse," and to "prioritize athlete safety over finances." (DSOF ¶ 74; PRDSOF ¶ 74 (emphasis omitted).)[6]

On November 24, 2017, the Chicago Sun-Times published a four-part series about Rick's 1995 USA Volleyball ban for having sex with minors and the additional accusations alleged victims shared since then, which are the subject of the 2016 USA Volleyball complaint. (DSOF ¶ 75; PRDSOF ¶ 75.) A few weeks later, on December 11, 2017, USA Volleyball's Ethics & Eligibility Committee banned Rick from membership for life after he violated an order protecting the identities of his alleged victims by including the 2016 USA Volleyball complaint lodged against him in his lawsuit against USA Volleyball. (DSOF ¶ 76; PRDSOF ¶ 76.) In a public statement, Rick said that a group of people were "inventing allegations against" him and asserted that USA Volleyball "falsely believes that its authority exceeds that of the U.S. Constitution" and "hopefully the [U.S. Olympic Committee] will take appropriate action to prevent abuses by USA Volleyball in the future." (DSOF ¶ 77;

---

[6] Plaintiffs dispute that this language appeared in each letter, but they do not cite to any evidence suggesting otherwise, so the court deems this statement admitted.

21

PRDSOF ¶ 77.)  The Chicago Sun-Times included these comments in a January 6, 2018 article reporting on the 1995 and 2016 USA Volleyball complaints and allegations that Rick engaged in "sexual[] abuse" of and made "inappropriate comments" to minors leading to the same.  (DSOF ¶ 78; PRDSOF ¶ 78.)

USA Volleyball held a hearing in early 2018 to address the allegations giving rise to the 2016 USA Volleyball complaint.  (DSOF ¶ 79; PRDSOF ¶ 79.)  Rick did not appear or otherwise present evidence at the hearing.  (DSOF ¶ 81; PRDSOF ¶ 81.) Thereafter, the Ethics & Eligibility Committee again banned Rick from USA Volleyball membership for life, which USA Volleyball announced in a January 10, 2018 press release.  (DSOF ¶ 84; PRDSOF ¶ 84.)  Specifically, the Committee found that Rick "engaged in multiple acts in violation of USA Volleyball's Bylaws," including "misconduct and abuse" of players.  (Id.)  There is no evidence that Defendants were involved in USA Volleyball's 2016-2018 investigation or its decision to ban Rick.  (DSOF ¶ 87.)[7]

After USA Volleyball announced the lifetime ban in 2018, multiple colleges informed Plaintiffs that they would no longer recruit Performance Club players, and the U.S. Center for SafeSport added Rick's name to its publicly accessible Centralized Disciplinary Database, reflecting permanent ineligibility for "Sexual Misconduct – involving a Minor."  (DSOF ¶¶ 88-89; PRDSOF ¶¶ 88-89.)

---

[7] Plaintiffs purport to dispute this fact but do not explain how the evidence they cite refutes it, and the court cannot discern why the fact is disputed based on its review of the same.  (See PRDSOF ¶ 87.)

On January 12, 2018, Rick and Cheryl sent a mass email to hundreds of families in the Performance Club and GLV community stating that they "have an open door policy to discussing these decades old allegations," "there is another side to this story," and they had "never had a family leave the program" once they have sat down to discuss the allegations. (DSOF ¶ 92; PRDSOF ¶ 92.) The email continues that "many" former players from the 1980s and 1990s have "chosen to have their daughters and sons participate in our programs" and closes by inviting parents to meet with them. (Id.)

A few days later, Hogshead-Makar emailed three high schools and three colleges asking them to disassociate from Rick, quoting from Rick and Cheryl's mass email and attaching prior news articles regarding Rick and the investigations and accusations against him, USA Volleyball's January 10, 2018 press release, the transcript from Rick's 1995 USA Volleyball hearing, and the link to the Change.org petition asking AAU to honor USA Volleyball's lifetime ban. (DSOF ¶ 93.)[8] Hogshead-Makar further stated in bold type: "Our letters, our effort, and our petition are bigger than removing a single coach from contact with athletes. It is about getting youth sports to abide by the principles that they purport to hold." (DSOF ¶ 94.)

Then, on February 9, 2018, AAU publicly announced that Rick was permanently disqualified from participating in any AAU activity and voided his

---

[8] Plaintiffs object to Defendants' statement because it is supported by counsel's declaration, rather than by Hogshead-Makar, and because the declaration does not directly support the paragraph's factual assertions. (PRDSOF ¶ 93.) But Plaintiffs do not dispute that Hogshead-Makar sent the letters, some of which are also cited and attached. (DSOF ¶ 93; PRDSOF ¶ 93.)

membership following a "review procedure" into "claims of misconduct." (DSOF ¶ 95; PRDSOF ¶ 95.) According to Plaintiffs, USA Volleyball pressured AAU to revoke Rick's membership. (DSOF ¶ 97; PRDSOF ¶ 97.) Thereafter, JVA issued a public statement announcing that Rick was suspended indefinitely "in accordance with the decision of the AAU." (DSOF ¶ 96; PRDSOF ¶ 96.) These announcements garnered significant media attention. (DSOF ¶ 98; PRDSOF ¶ 98.) Plaintiffs responded by publishing a document entitled "Our Story" online—which received more than 1,200 views in the first hour alone—and sharing copies with members of the volleyball community. (DSOF ¶¶ 99-100; PRDSOF ¶¶ 99-100.)

Hogshead-Makar sent another round of emails between February 13 and February 23, 2018, to 4 organizations and 106 volleyball clubs that largely mirrored her January 2018 letters but also attached copies of the AAU and JVA public statements. (DSOF ¶ 101.) A few days later, on February 27, 2018, Laura Mullen filed a class action lawsuit in this district, *Mullen v. GLV, Inc.*, No. 18 CV 1465 (N.D. Ill.), accusing Rick of raping, grooming, and sexually, physically, and emotionally abusing at least six minors in the 1980s, Rick and Cheryl of threatening victims and their families into silence, and Plaintiffs of making numerous false and misleading public statements to conceal Rick's conduct ("Mullen Class Action"). (DSOF ¶¶ 102, 104 & Ex. 51; PRDSOF ¶ 104.) The Mullen Class Action also alleged a "special relationship" between Plaintiffs and a list of colleges and sports organizations. (DSOF ¶ 103; PRDSOF ¶ 103.) Shortly after the filing of the Mullen Class Action, on March 1, 2018, Plaintiffs sent another email to Performance Club parents, saying

24

that "the truth t[ook] a backseat" on the allegations against Rick, the door is "open as it always has been should you have any questions," and a "number of Performance Club alums from the 1980's and 1990's" sent their children to Performance Club programs. (DSOF ¶ 107; PRDSOF ¶ 107.)

In a declaration Rick prepared in connection with the Mullen Class Action, he said the following:

- "After the [c]omplaint was filed listing various locations where we hold our camps each year, we lost several hundred thousand dollars in revenue due to certain locations pulling their contracts with us."

- "Many of our affiliated organizations and camp sites told us they had received threatening letters from Plaintiff's counsel which made them reconsider their business relationship with us, because they were afraid they would somehow get dragged into this lawsuit."

- "After the Complaint was filed and received publicity, over one thousand teams pulled out of our events despite most, if not all, having prior knowledge of the allegations from the 1980s. As a result, we lost substantial revenue from events . . . ."

- "Many of [the teams pulling out] expressly told me that they were only leaving because they were afraid of being targeted as part of the publicity surrounding this lawsuit."

- "Our corporate sponsors and affiliates were also the target of public harassment for doing business with [Performance Club]. Mizuno, Athletico, and Molten all were targeted. As a result, GLV lost a 10-year contract with Mizuno that was worth approximately $1 million to the business."

- "Our loss in revenue is from the organizations who have worked with us for years that have recently been scared away by the vitriolic nature and threats of people like Laura Mullen and the others involved in the attempt to destroy our business."

25

(DSOF ¶ 105 & Ex. 53 ¶¶ 21-24; PRDSOF ¶ 105.) Ultimately, Plaintiffs prevailed in the Mullen Class Action at the summary judgment stage and thereafter filed a malicious prosecution case against Mullen and her counsel alleging that Plaintiffs' business affiliates had been "threatened with boycotts, cancelation of their business contracts, and/or personal harassment" because they were named in the Mullen Class Action. (DSOF ¶ 106; PRDSOF ¶ 106.)

But the parties in this case and media were not the only ones communicating about Rick and his coaching career in 2018. Indeed, in January 2018 Matthew Pfouts—a self-described "advocate for the sport of volleyball" not involved in this action—sent an email to 54 college programs that had recruited from Performance Club in the past, asking them to "use [their] collective strength" to end Rick's coaching career. (DSOF ¶ 108 & Ex. 47.) And in March 2018 a former Performance Club player and Olympian Nancy Reno wrote to Rick demanding he "immediately" remove a banner bearing her name from his facility, citing "deplorable" and "reprehensible" acts he committed against her teammates. (DSOF ¶ 109 & Ex. 72; PRDSOF ¶ 109.) Reno's message was ultimately shared on social media. (Id.)

Moreover, in May 2018 at a congressional hearing entitled "Examining the Olympic Community's Ability to Protect Athletes from Sexual Abuse," USA Volleyball's then-CEO Jamie Davis spoke about Rick, the 1995 USA Volleyball investigation, how he was reinstated and allowed to coach minor girls after his initial lifetime ban, and the new claims that surfaced in 2016. (DSOF ¶¶ 110-11; PRDSOF ¶¶ 110-11.) That same month, Walt Disney World Resorts, which historically hosted

26

AAU's national volleyball tournament, banned Rick from its property because of USA Volleyball's and AAU's bans. (DSOF ¶ 112; PRDSOF ¶ 112.)

The following month, CEO Davis sent a letter to approximately 42 regional volleyball associations across the country informing them that he had urged the American Volleyball Coaches Association to permanently ban Rick's membership and strip him of all accolades. (DSOF ¶ 113; PRDSOF ¶ 113.) He also indicated that USA Volleyball had adopted a new policy prohibiting attendance at its sanctioned events by anyone found to have violated the SafeSport Code or who committed an offense that could jeopardize the safety of others. (Id.) His letter attached a copy of USA Volleyball's suspended members list, which includes Rick. (Id.)

News coverage of sexual abuse in sports continued in 2018, and Rick's name and his ability to continue coaching came up in nearly every article related to sexual abuse in any sport. (DSOF ¶ 114; PRDSOF ¶ 114.) Rick described it as "kind of the perfect storm at the time," noting "there w[ere] a lot of people [who] had a chance to benefit if . . . our business went down." (DSOF ¶ 115; PRDSOF ¶ 115.) In fact, publicity regarding Rick's alleged sexual assault of his players continues even today, and Rick and Cheryl continue to engage in public discussions on the issue, including through social media, their lawyers' website, and a podcast. (DSOF ¶¶ 116-17; PRDSOF ¶¶ 116-17.)

27

**D. The 2021 Lawsuit**

The operative complaint here alleges damages stemming from Hogshead-Makar's Letter-Writing Campaign and social media publications between June 2017 and May 2018, which include the following statements Plaintiffs allege in their complaint are false and defamatory:

- Rick is a "rapist" and "bona fide sexual predator."

- Rick is a "pedophile."

- Rick "was publicly accused in 1995 of sexually abusing and raping six underage girls he trained in the 1980s."

- "A court found that Rick Butler wasn't credible, pursuant to an adoption."

- "[L]ong-standing ethics rules prohibit coaches from engaging in romantic and sexual relationships with the athletes they coach, *regardless of age or consent*."

- "USA Volleyball allowed Rick Butler to reapply five years later after being threatened with litigation. USAV allowed him to hold administrative volleyball positions and to coach boys. But he is clearly not adhering to those limits; he is coaching hundreds of young girls, including those at your school, MSU. USAV is well aware of this violation, and they've done nothing."

- "Rick Butler has been kicked out of USA Volleyball, AAU Volleyball, and Junior Volleyball Association for sexually abusing at least 6 of his underage players."

- "[O]n January 10, 2018, USA Volleyball found that Rick Butler sexually abused four minor girls, and physically and verbally abused a fifth."

- "Rick Butler has now been banned for life from USA Volleyball for the second time, explicitly for the sexual abuse of minor girls he coached."

28

- "That Cheryl knew about Rick's abuse and bullied his victims into silence."

(DSOF ¶ 119; PRDSOF ¶ 119; R. 15, Am. Compl. ¶¶ 24, 50, 51(j)-(k), 53, 56, 57(a)-(c), (e)-(f), (h), 61(d), 155.)

Hogshead-Makar says her objective was to ensure athlete safety, her statements were informed by "numerous fact finders" who had concluded that Rick had "abused minor girls" and credible sources reporting the same, and her efforts were "not personal to Rick Butler" but rather were intended to "clean up sport." (DSOF ¶ 120, Ex. 3 at 105, 253, 284-288, 310-312.) When asked whether she ever had a "high degree of awareness that [she] was publishing something false about Rick," she answered, "Never. No." (Id. ¶ 120, Ex. 3 at 287.) And when asked whether she "ever entertain[ed] serious doubts about the truthfulness about [her] statement about Rick," she answered, "No." (Id.) She also testified at her deposition that she was concerned that Rick told volleyball families that his relationships were with of-age former players only, which was "very different than what the documentation [by USA Volleyball] said." (DSOF ¶ 121, Ex. 3 at 199-200 & Ex. 48.)

As to DiMatteo, the operative complaint alleges that:

- In March 2018 DiMatteo "commented on a public Facebook post about a 'big meeting' she was holding that week to persuade 'all the good clubs' to leave GLV's events based on the recent negative publicity (generated by the Defendants) about Rick Butler."

- "DiMatteo urged Chicago-area clubs and teams to 'quit supporting' GLV events with their attendance."

- "DiMatteo encouraged the volleyball community to 'cut off' the Butlers' revenue by boycotting GLV events."

29

- "DiMatteo encouraged the public to donate to Champion Women, saying that the organization's 'hard work needs to continue' against the Butlers."

- DiMatteo signed a Change.org petition started by a third party in May 2020 to boycott Mizuno and commented, "No one should sponsor Rick Butler and [Performance Club] . . . he got away with murder."[9]

- DiMatteo promoted herself as a brand representative for Asics in Facebook conversations where others called for a boycott of Mizuno and posted a photo of Rick in her Facebook comments asking Mizuno if it was "proud of him wearing their logo."

- DiMatteo wrote a letter to Mizuno stating, "You have to be kidding to go back into a partnership with [Performance Club] read all the media on them and all the things that happened over the years [sic] everybody who can will be boycotting Mizuno over this reopening of your sponsorship please reconsider that [sic]."[10]

---

[9]  There is no evidence that anyone read this Facebook comment and believed Rick committed murder.  (DSOF ¶ 129; PRDSOF ¶ 129.)

[10]  The complaint also alleges that:
- DiMatteo "publicly advocated for the Orange County Convention Center, the Louisville Convention Center, and Disney's ESPN Wide World of Sports to prohibit Rick from attending events at their sports facilities."

- "On information and belief," posted on "anonymous online forum" Volleytalk under an alias to "solicit donations for the defense of this lawsuit," threatened Plaintiffs with a "counter suit" that would "cost . . . a lot more plus dragged [sic] back thru the media," and posted a link to the Butlers' "home address with a photograph of their home."

(DSOF ¶ 125, citing R. 15, Am. Compl. ¶¶ 151, 158-59.)  But Plaintiffs no longer say Defendants were responsible for Disney's ban, and while they dispute whether there is evidence that DiMatteo published under the Volleytalk alias, for support they point to the same deposition testimony in which DiMatteo says her husband made the posts without her knowledge (and nothing more).  (DSOF ¶ 125; PRDSOF ¶ 125.)

(DSOF ¶ 124; PRDSOF ¶ 124; R. 15, Am. Compl. ¶¶ 21, 92, 58, 71, 77, 80-84.)[11] DiMatteo explains that her knowledge about Rick's sexual abuse of minors and resulting membership bans came from news reports, which helped form her opinion that Rick should not continue to coach volleyball and spurred her involvement in the issue. (DSOF ¶ 127; PRDSOF ¶ 127.)

Plaintiffs argue that there are factual disputes as to whether DiMatteo: (1) caused clubs to leave their league to join a competing league; (2) intentionally interfered with their business to grow her own or profit therefrom; (3) knowingly or recklessly published false statements about them; (4) met Hogshead-Makar before being named as a Defendant in this lawsuit; and (5) participated in Hogshead-Makar's Letter-Writing Campaign. (DSOF ¶¶ 126, 128, 130-31, 133; PRDSOF ¶ 126, 128, 130-31, 133.) But Plaintiffs point only to exhibits appended to their LR 56.1 statement of additional facts (not considered here), one of which consists of a 77-page document with no specific citation, reference, or explanation. (Id.)

In response to Plaintiffs' complaint, Defendants launched a GoFundMe campaign in April 2022 to help cover their legal costs in defending this lawsuit, and that campaign repeats allegations about Rick's sexual abuse of minors while coaching and was posted to social media Defendants forwarded to Chicago-area volleyball clubs and organizations. (DSOF ¶ 132; PRDSOF ¶ 132.) In 2022 Plaintiffs sold

---

[11] While Plaintiffs state they "do not dispute that the quoted statement(s) appear in the [Amended Complaint]," they also indicate this fact paragraph is "disputed," citing a 32-page exhibit with no explanation. (PRDSOF ¶ 124.) The court is unable to discern how this exhibit disputes this fact paragraph. As such, the court deems it admitted.

31

Performance Club and now operate Atlanta Performance Volleyball in Atlanta, Georgia, through which Rick continues to coach minor girls. (DSOF ¶ 145; PRDSOF ¶ 145.)

### Analysis

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court considers the entire evidentiary record but must view all evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). But to survive summary judgment, the nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the record under this standard, the court finds that Defendants are entitled to summary judgment.

### A.     Timeliness

Defendants argue at the outset that this lawsuit is time-barred under Illinois's one-year statute of limitations applicable to defamation claims, which they say Plaintiffs cannot evade by titling their claims differently. (R. 145, DiMatteo's Mem. at 3-5; R. 148, Hogshead-Makar & Champion Women's Mem. at 5-6.) DiMatteo points

out that Plaintiffs' claims against her center on her 2018 social media posts and a May 2020 Change.org petition she signed more than a year before Plaintiffs filed this action in December 2021. (R. 145, DiMatteo's Mem. at 5 (citing R. 1, Compl.).) In turn, Hogshead-Makar and Champion Women note that Plaintiffs' claims against them center around statements they made in 2017 and 2018. (R. 148, Hogshead-Makar & Champion Women's Mem. at 5-6.) Plaintiffs do not directly respond to this argument but repeatedly dispute that they assert defamation claims. (See R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 1, 4, 8.)

It is true that "[a] party . . . may not circumvent a shorter period of limitations, or attempt to breathe new life into a stale claim, merely by means of artful pleading." *Armstrong v. Guigler*, 673 N.E.2d 290, 293 (Ill. 1996). But where a plaintiff demonstrates wrongful conduct to satisfy each element of a tortious interference and related conspiracy claim—that is, beyond mere defamatory publication—Illinois's five-year catch-all statute of limitations must apply. *See Colucci v. Chi. Crime Comm'n*, 334 N.E.2d 461, 469-70 (Ill. App. Ct. 1975) (holding five-year statute of limitations applicable to "separate and distinct" tortious interference claim stemming from the defendant's urging others to cease doing business with plaintiff "for false and defamatory reasons"); *see also Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 306 N.E.2d 549, 553 (Ill. App. Ct. 1973) (holding that the fact that defamatory statements are "the means by which the tortious interference is committed" does not "subject the action to a limitation period" applicable to defamation claims); *Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 894 (Ill. App. Ct. 2013)

33

(holding that a conspiracy claim is "governed by the statute of limitations for the underlying tort"). Plaintiffs' claims against Defendants center on Defendants' efforts to persuade various organizations to take their business elsewhere because of Rick's alleged sexual abuse and, as such, they extend beyond mere defamation. Because all such efforts occurred within the five-year period before December 2021, the statute-of-limitations argument fails.

## B.    Malice

Defendants also say Plaintiffs are limited-purpose public figures but Plaintiffs cannot offer any evidence that Defendants acted with actual malice as required for their case to proceed past this point. (R. 145, DiMatteo's Mem. at 5-14; R. 148, Hogshead-Makar & Champion Women's Mem. at 6-13.) Public figures cannot prevail on a defamation claim absent clear and convincing evidence that in making the complained-of statement the defendant acted with "actual malice," meaning that the false statement at issue was made "with knowledge that it was false or with reckless disregard for whether it was false." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Here, Plaintiffs assert the "public figure" analysis has no place because again, their claims concern tortious interference and conspiracy, not defamation. (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 8.)

The Seventh Circuit has not directly addressed whether the actual-malice analysis for a public figure extends beyond defamation to speech-based tortious interference claims but has stated in *dicta* that allowing a plaintiff to recast a defamation claim as one for conspiracy to avoid having to plead actual malice would

34

be "nonsensical" and "cannot be permitted." *Tierney v. Vahle*, 304 F.3d 734, 742-43 (7th Cir. 2002). Further, other federal circuit courts and at least one district court in this circuit have extended the actual-malice analysis for a public figure, or other First Amendment defamation protections, to tortious interference claims based on similar reasoning, citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)—in which the Supreme Court applied the "actual malice" standard for a public figure to a claim for intentional infliction of emotional distress. *See Beverly Hills Foodland, Inc. v. United Food and Com. Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (applying actual-malice analysis for public figure to tortious interference with contract claim); *Jefferson Cnty. Sch. Dist. v. Moody's Inv.'s Servs., Inc.*, 175 F.3d 848, 856-58 (10th Cir. 1999) (applying First Amendment protection to statement of opinion for purposes of tortious interference with contract and prospective business relations claims); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (affirming dismissal of tortious interference with business relations claim because speech protected by First Amendment was "substantially true"); *Next Tech., Inc. v. Beyond the Off. Door LLC*, No. 19 CV 217, 2020 WL 3077052, at *13-14 (W.D. Wis. June 10, 2020), *aff'd on other grounds*, 992 F.3d 589 (7th Cir. 2021) (applying actual-malice analysis for public figure to tortious interference with existing and prospective contract claims). This court is persuaded by the same logic and rejects Plaintiffs' gatekeeping argument that the actual malice analysis for a public figure cannot apply here because of how they styled their pleading. *See Compuware v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 530 (6th Cir. 2007) (noting that after *Falwell*, circuit courts "imposed the actual-malice

standard on other tort claims predicated on defamatory speech, recognizing that a plaintiff may not avoid" constitutional protections through "creative pleading").

Plaintiffs next argue that the actual-malice analysis cannot apply to their claims because they are not public figures. (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 8.) But whether Plaintiffs are public figures is a question of law for the court, *Kessler v. Zekman*, 620 N.E.2d 1249, 1256 (Ill. App. Ct. 1993), and in any event this issue cuts against Plaintiffs. Public figures are those "intimately involved in the resolution of important public questions," *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164 (1975), either "for all purposes and in all contexts" or for a limited purpose on a "limited range of issues," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Here, Defendants say Plaintiffs qualify as limited-purpose public figures. (R. 145, DiMatteo's Mem. at 5-12; R. 148, Hogshead-Makar & Champion Women's Mem. at 6-12.) Such is the case under Illinois law if: (1) there is a "public controversy" that "impacts the general public or some portion of it in an appreciable way"; (2) the plaintiff undertook "some voluntary act seeking to influence the resolution" of that controversy; and (3) the statement at issue was "germane to the plaintiff's participation in the controversy." *Osundairo v. Glandian*, No. 19 CV 2727, 2024 WL 5186922, at *4 (N.D. Ill. Dec. 20, 2024) (quoting *Jacobson v. CVS Broad., Inc.*, 19 N.E.3d 1165, 1176 (Ill. App. Ct. 2014)). In addition, for public figure status to apply, the defendant cannot have created the controversy. *Hutchinson v. Proxmire*, 443 U.S.

36

111, 135 (1979) (holding "those charged with defamation cannot, by their own conduct, create their own defense, by making the claimant a public figure").

Defendants say two relevant "public controversies" concerning a portion of the public exist, and neither was of their own making. The first such controversy relates to whether Rick should be permitted to coach minor girls notwithstanding the sexual abuse findings against him, and the second addresses how to protect youth athletes from sexual assault more generally. (R. 145, DiMatteo's Mem. at 6-7; R. 148, Hogshead-Makar & Champion Women's Mem. at 7-8.) Plaintiffs do not quarrel with Defendants' framing of these issues, (see generally R. 166, Pls.' Hogshead-Makar & Champion Women Resp.), and nor could they, given local and national news coverage concerning the 1994-1995 DCFS and USA Volleyball investigations into Rick, USA Volleyball's banning of Rick in 1995, his coaching of junior girls thereafter, USA Volleyball's 2016-2018 investigation into newly raised allegations regarding Rick's sexual and other misconduct involving minors, and Rick's 2018 membership bans from USA Volleyball, AAU, JVA, and SafeSport, (see, e.g., DSOF ¶¶ 22, 26, 31-33, 50, 95-96, 114). The first prong of the public figure inquiry is thus easily satisfied even if not waived. *Wojtas v. Cap. Guardian Trust Co.,* 477 F.3d 924, 926 (7th Cir. 2007) (failure to oppose argument constitutes waiver).

As for the second prong, Plaintiffs argue that they did not voluntarily enter the debate on these controversies. Rather, they were "drawn into a public forum against their will" to "defend themselves against actions brought by others." (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 8.) This argument fails out of the

37

gate. For support Plaintiffs point to *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976), in which the plaintiff brought a libel action against a newspaper for its reporting on her divorce from an heir to the Firestone family fortune. (R. 166, Pl.'s Hogshead-Makar & Champion Women Resp. at 8.) The defendant newspaper argued that the plaintiff was a public figure for purposes of her divorce proceeding and therefore had to demonstrate actual malice to prevail. *Firestone*, 424 U.S. at 453-54. But the Supreme Court disagreed, holding that the divorce was not a "public controversy" because it did not impact others. *Id.* And even though the plaintiff held a few press conferences to discuss the proceedings, the Court found they were not "voluntary act[s]" within the scope of the public figure inquiry because the interviews "should have had no effect" on the divorce proceedings. (Id. at 454 & n.3.)

In contrast, Plaintiffs here sought to convince sports organizations and schools to allow Rick to coach minor girls at their tournaments, camps, and/or facilities and to persuade parents to entrust their children to his care. Plaintiffs did so throughout the relevant period by broadly sharing Rick's version of the story, including through interviews, published stories, letters to parents and players, and podcasts. (See, e.g. DSOF ¶¶ 34-35, 37, 59, 92, 99-100, 107, 117.) Having "expose[d] themselves to the public in order to sway opinions," Plaintiffs have "invite[d] attention and comment" and accepted the risk of being "cast . . . in an unfavorable light."

*See Kessler*, 620 N.E.2d at 1257 (citing *Gertz*, 418 U.S. at 345). As such, the second prong is also satisfied.[12]

Plaintiffs do not directly address the third prong—whether Defendants' statements were germane to Plaintiffs' participation in the controversy. (See generally R. 166, Pls.' Hogshead-Makar & Champion Women Resp.) The court views that failure as a concession that Defendants' statements are central to the controversy at issue, *Wojtas*, 477 F.3d at 926 (failure to offer opposition to argument constitutes waiver), and agrees this is so for each Defendant. First, Defendants are correct that Hogshead-Makar's (and by extension, Champion Women's) statements and Letter-Writing Campaign concerning Rick were designed to refute what they say was Plaintiffs' "false and misleading narrative" that Rick should be permitted to coach junior girls because the allegations against him were decades old, his sexual relationships were consensual, and he had sex only with players who were at least 18 and had left his program. (See R. 148, Hogshead-Makar & Champion Women's Mem.

---

[12] Defendants assert that Rick and Cheryl's company, Plaintiff GLV, is as much a public figure as they are, pointing out that GLV and Rick are often referenced interchangeably in Rick's and Cheryl's communications, and that corporate entities may also be considered public figures. (See R. 145, DiMatteo's Mem. at 8-10 (citing *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir. 1983) (stating "there seems no reason to classify a large corporation as a private person" if the "purpose of the public figure-private person dichotomy is to protect the privacy of individuals who do not seek publicity or engage in activities that place them in the public eye")); see also R. 148, Hogshead-Makar & Champion Women's Mem. at 8-10 (same)); *Desnick v. Am. Broad. Cos., Inc.* 233 F.3d 514, 517 (7th Cir. 2000) (treating eye clinic as public figure). Plaintiffs do not address this point in their response, waiving any argument refuting it. (See generally R. 166, Pls.' Hogshead-Makar & Champion Women Resp.); *see also Wojtas*, 477 F.3d at 926 (failure to offer opposition to argument constitutes waiver).

at 10-12). So too were DiMatteo's comments on social media publicly encouraging others to boycott or end partnerships with Plaintiffs and their programs. (R. 145, DiMatteo's Mem. at 11-12 (citing DSOF ¶ 124).) Because Defendants' statements "bear[] on the credibility" of Plaintiffs on the precise issues in question, this third prong is also satisfied. *See Kessler*, 620 N.E.2d at 1257 (finding statement that "bears on the credibility of [the plaintiff,] a leading proponent of one side of a debated subject," is germane to plaintiff's participation in debate "because of the effect it may have on the way society perceives the message he advances or the opinion he espouses"). With all three prongs being satisfied, the court finds that Plaintiffs are public figures with respect to the controversies identified and turns to whether there is sufficient evidence of actual malice to allow this case to proceed to trial.

"Actual malice" for this purpose concerns the defendant's state of mind about whether a statement is false. *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir. 1986); *see also Madison v. Frazier*, 539 F.3d 646, 657 (7th Cir. 2008) (holding that actual malice inquiry is subjective). To survive summary judgment, a plaintiff must demonstrate with "convincing clarity"—a standard of proof higher than "preponderance of the evidence" but lower than "beyond a reasonable doubt," that the defendant either was "actually aware" that their statement was false or had reckless disregard for its truth or falsity. *N.Y. Times*, 376 U.S. at 280; *Woods*, 791 F.2d at 484; *see also Anderson*, 477 U.S. at 256-57 (holding plaintiff must present evidence from which a reasonable jury could conclude with convincing clarity that defendant acted with actual malice to survive summary judgment).

40

Reckless disregard for falsity is established through evidence that the defendant "in fact entertained serious doubts as to [the statement's] truth," *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968), or made the statement with a "high degree of awareness of [its] probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Such is the case where the defendant fabricated the story or based it entirely on an unverified anonymous phone call, *Woods*, 791 F.2d at 485, or there are otherwise "obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *Herbert v. Lando*, 441 U.S. 153, 156-57 (1979) (first quoting *Gertz*, 418 U.S. at 335 n.6; then quoting *St. Amant*, 390 U.S. at 732). Notably, neither mere negligence nor "proof of failure to investigate" alone is sufficient to meet this heightened evidentiary standard because "[p]roof of actual malice . . . depends upon the defendant's actual state of mind." *Woods*, 791 F.2d at 485 (citing *Herbert*, 441 U.S. at 160).

Plaintiffs argue that Hogshead-Makar used her position as a "prominent attorney" with "expertise in the exact area of law" at issue, and Champion Women its role as a "legal advocacy organization with expertise in public relations, sports law, and governance," to craft a "new story" about Rick through "repeated, intentional manipulation of facts." (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 8-9.) But they miss that "actual malice" is "separate from common law malice or ill will, hatred or wanton desire to injure the person defamed." *Newell v. Field Enters., Inc.*, 415 N.E.2d 434, 451 (Ill. App. Ct. 1980). And they offer nothing but vague inferences to support their assertions that the alleged misrepresentations to which they allude—that is, regarding the "basic facts of [USA Volleyball's] 1995 ban" and

41

Hogshead-Makar's "repeated[] claim[]" that Rick was a "pedophile," (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 9)—were made with requisite knowledge of, or reckless disregard for, falsity.

In fact, Plaintiffs fail to cite any alleged inaccuracy in the summary judgment record to support their actual malice argument. (R. 166, Pls.' Hogshead-Makar & Champion Women Resp.) Nor do Plaintiffs point to anything to contradict Hogshead-Makar's testimony regarding the materials on which she relied to prepare her communications, her desire "to make sure that everything was accurate" and to "not misstat[e] facts," or her answers of "never" and "no" when asked whether she had a "high degree of awareness that [she] [was] publishing something false" or ever "entertain[ed] serious doubts about the truthfulness about [her] statement[s]." (DSOF ¶ 67 & Ex. 3, 101, 286-87.) Having failed to identify in nearly all cases "*which* statement[s] [are] misrepresentation[s]"[13] and in all cases "*why* [they are] misrepresentation[s]" and "*what* evidence supports" knowing misrepresentations or reckless disregard for the falsity of statements by Hogshead-Makar and Champion Women, (R. 179, Hogshead-Makar & Champion Women's Reply at 6), Plaintiffs have not met their substantial burden of demonstrating that a reasonable jury could find actual malice with "convincing clarity," *see Kessler*, 620 N.E.2d at 1261 (finding

---

[13] Plaintiffs' complaint alleges that Defendants used other problematic words and phrases. (See, e.g., DSOF ¶ 119; PRDSOF ¶ 119; R. 15, Am. Compl. ¶¶ 24, 50, 51(j)-(k), 53, 56, 57(a)-(c), (e)-(f), (h), 61(d), 155.) But Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

42

inference of personal animosity alone insufficient to counter defendants' uncontroverted attestations on summary judgment that they entertained no serious doubts about the veracity of their statements when made); *see also Anderson*, 477 U.S. at 257 (holding that the plaintiff must present evidence sufficient for a reasonable jury to find actual malice with convincing clarity to survive summary judgment); *Herbert*, 441 U.S. at 174 (describing actual malice evidentiary burden as "substantial indeed").

Moreover, even if the court were to exercise Plaintiffs' due diligence for them to locate the instances in which Hogshead-Makar or Champion Women described Rick as a "pedophile" in communications, (see DSOF ¶ 119(b)), the court agrees with Defendants that such utterance is not actionable. Indeed, while the DSM-V definition for the term refers to an adult or older adolescent with sexual attraction to prepubescent children, the word is broadly and popularly used to refer to an adult with sexual interest in a child of any age. *See Pedophilia*, Wikipedia, https://en.wikipedia.org/wiki/Pedophilia (last visited June 3, 2026) (stating that "[i]n popular usage," the word "pedophilia" is "often applied to any sexual interest . . . in minors below the local age of consent or age of adulthood, regardless of their level of physical or mental development"). Hogshead-Makar's and Champion Women's communications correctly indicated that the affected players were high school age, not pre-pubescent, so this speech is subject to an "innocent construction" and non-actionable. *See Green v. Rogers*, 917 N.E.2d 450, 463 (Ill. 2009) (holding statement that "may reasonably be innocently interpreted" in context cannot be actionable).

Plaintiffs' case as to DiMatteo fails at this stage too. In fact, even if the court were to consider Plaintiffs' response to DiMatteo's motion and LR 56.1 statement of additional facts, Plaintiffs do not dispute DiMatteo's testimony that her knowledge of the allegations surrounding Rick was sourced from media reports or otherwise suggest she knew or had reckless disregard for whether anything she said about Rick was false. (DSOF ¶ 127; PRDSOF ¶ 127); *see also Anderson*, 477 U.S. at 256 (holding that while "[t]he movant has the burden of showing that there is no genuine issue of fact . . . the plaintiff is not thereby relieved of his own burden of producing in turn evidence [of actual malice] that would support a jury verdict"). And Plaintiffs cannot recover against DiMatteo because she shared her opinions. *See generally Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1 (Ill. App. Ct. 1995) (affirming summary judgment on tortious interference with prospective business relations claim in part because statements at issue constituted opinions). In sum, the court agrees with Defendants that "Plaintiffs' inability to meet [the actual malice] burden of proof sounds the death knell to their entire lawsuit." (R. 145, DiMatteo's Mem. at 6); *see also Harris v. Quadracci*, 48 F.3d 247 (7th Cir. 1995) (affirming summary judgment for the defendant in public figure case where the plaintiff failed to produce sufficient evidence of actual malice).[14]

---

[14] In addition to their actual-malice argument, Defendants say the speech with which Plaintiffs take issue in their operative complaint is not actionable because it is subject to innocent construction, First Amendment opinion protection, the substantial truth doctrine, the right to speak and assemble, and/or the fair report privilege. (R. 145, DiMatteo's Mem. at 14-23; R. 148, Hogshead-Makar & Champion Women's Mem. at 13-23.) But having determined that Plaintiffs do not demonstrate actual malice, the court need not reach these arguments, which Plaintiffs did not address in any case

## C. Tort Elements

Having concluded that Plaintiffs failed to carry their burden of demonstrating "actual malice," the court need not address the merits of their claims. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984) (describing "actual malice" inquiry as a "constitutional threshold" question). However, the court does so briefly for the sake of completeness because there are issues there too. To sustain their claim for tortious interference with contract under Illinois law (Count I), Plaintiffs must show: "1) the existence of a valid and enforceable contract []; 2) that the defendant was aware of the contractual relationship; 3) an intentional and unjustified inducement of a breach of the contract by the defendant; 4) [that the breach was] caused by the defendant's inducement; and 5) damages." *Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994). And for their tortious interference with business advantage claim (Count II), Plaintiffs must show: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007). But as to Count I, despite asserting "longstanding contractual relationships with clubs, schools, leagues, sponsors, and event partners," Plaintiffs have produced just one draft, unsigned agreement between

---

and have therefore waived. *Wojtas*, 477 F.3d at 926 (failure to oppose argument constitutes waiver); (see generally R. 166, Pls.' Hogshead-Makar & Champion Women Resp.).

45

GLV and Mizuno. (See DSOF ¶ 139(a).) The "inability to establish the existence of a valid and enforceable contract is obviously fatal" to a tortious interference with contract claim. *Brodsky v. Blake*, No. 17 CV 5222, 2018 WL 1138539, at *5 (N.D. Ill. March 2, 2018) (quoting *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992)).

Plaintiffs' response goes on to conflate their tortious interference with contract and with business advantage claims—in an apparent attempt to gloss over this failure of evidence. (See R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 10 (suggesting that evidence of Plaintiffs' "established course of dealing and repeated prior transactions" with others may sustain both tortious interference claims).) Yet the torts are separate and distinct, so this effort falls flat. *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 874 (Ill. App. Ct. 2023) (noting tortious interference with and without contractual relationships are "similar but distinct" torts in Illinois).

Plaintiffs' ability to establish causation—necessary for both Counts I and II— is likewise in doubt. Causation for these purposes requires that Defendants' conduct was the but-for and proximate cause of the termination of the contracts or business relationships identified. *Parson v. Allstate Ins. Co.*, No. 24 CV 1493, 2026 WL 811303, at *7 (N.D. Ill. March 23, 2026) (stating "the *prima facie* elements of tortious interference with prospective economic advantage require the plaintiff to show but-for causation and proximate causation" (citing *Grako*, 229 N.E.2d at 880-81)). Here, Plaintiffs point to little more than Defendants' own statements to establish causation.

Specifically, they cite to: an email from Hogshead-Makar to "Senate Commerce Committee Staff" describing her and Champion Women's efforts to "remove" Rick from coaching; excerpts from Hogshead-Makar's and Champion Women's Letter-Writing Campaign in which Hogshead-Makar and Champion Women take credit for Mizuno and Molten discontinuing their respective Performance Club sponsorships; and part of a letter from Hogshead-Makar to Senator Richard Blumenthal stating, "When we write to schools hosting [Rick's] summer clinics, they drop him almost immediately." (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 11-13.). But none of this evidence establishes causation, and the record is riddled with Plaintiffs' complaints of other causes disconnected from Defendants. (See, e.g., DSOF ¶¶ 95, 105-06, 115; PRDSOF ¶¶ 95, 105-06, 115.) Moreover, the cases Plaintiffs cite supporting a different causation standard are inapposite. Indeed, *George A. Fuller Co. v Chicago College of Osteopathic Medicine*, 719 F.2d 1326 (7th Cir. 1983), does not discuss causation, *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), discusses causation only in relation to a civil RICO claim, and the court could not locate a case bearing the title and citation "*City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.2d 447 (1958)."[15]

The problems with Plaintiffs' case do not end there. To support their tortious interference with business advantage claim, Plaintiffs point generally to

---

[15] Although there is another Illinois case bearing the same title that concerns a tortious interference claim, it was decided 15 years after the case Plaintiffs purport to cite and does not discuss causation. *See generally City of Rock Falls v. Chi. Title & Tr. Co.*, 300 N.E.2d 331 (Ill. App. Ct. 1973).

47

relationships with "Chicago-area clubs," which they say included "consistent and valuable customers" that "returned to GLV events year after year and accounted for a substantial portion of Plaintiffs' revenue." (R. 166, Pls.' Hogshead-Makar & Champion Women Resp. at 10-11.) But Plaintiffs fail to name any specific club, and do not cite any record evidence for support. (See id.); *see also Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17 CV 5826, 2023 WL 5334638, at *34 (N.D. Ill. Aug. 18, 2023) ("To get past summary judgment, a plaintiff must identify a *specific* third party with whom the plaintiff would have done business but for the defendant's interference.") (collecting cases). The court declines to do Plaintiffs' job for them or rely on their pleadings. Moreover, there is no evidence of direct contact between DiMatteo and any club or other prospective business partner. *See Assoc. Underwriters of Am. Agency, Inc. v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005) ("A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party."); *Dry Enter., Inc. v. Sunjut AS*, No. 07 CV 1657, 2008 WL 904902, at *9 (N.D. Ill. March 31, 2008) (same).

Plaintiffs do not discuss their IUDTPA claim (Count III) against Hogshead-Makar or Champion Women at all, let alone respond to Defendants' arguments concerning the same. (See generally R. 166, Pls.' Hogshead-Makar & Champion Women Resp.) Plaintiffs have thus abandoned the claim. *See De v. City of Chi.*, 272 F. Supp. 2d 717, 726 (N.D. Ill. 2003) ("Failure . . . to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the

48

nonmoving party's arguments and an abandonment of his claims." (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003))).  Finally, Defendants are correct that Plaintiffs' conspiracy claim (Count V) rises and falls with the torts they assert because there is no standalone conspiracy claim.  *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 612 (N.D. Ill. 2023) ("[P]roof of civil conspiracy requires proof of an underlying tort." (citing *McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999))).

## Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are granted and summary judgment is entered in their favor.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**

49